[Crim. No. 12937. In Bank. Aug. 18, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO CARRASCO SALAS, Defendant and Appellant.

## COUNSEL

Robert Carl Anderson, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Edward A. Hinz, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—A jury found defendant guilty of first degree murder (Pen. Code, §§ 187, 189) and first degree robbery (Pen. Code, §§ 211, 211a) and fixed the penalty for the murder at death (Pen. Code, § 190).[1] Defendant's motion for a new trial was denied. As the death penalty cannot be constitutionally imposed we modify the judgment in accordance with

---

[1] Unless otherwise indicated section references are to sections of the Penal Code.

*People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] (see also *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]), reject defendant's various contentions on this automatic appeal (§ 1239, subd. (b)) which are not directed to the impropriety of the death penalty and, as modified, affirm the judgment.

On the morning of June 7, 1968, five or ten minutes after midnight, defendant entered the Hub Bar in Sacramento and asked the bartender, George Finnegan, for a six-pack of beer. After Finnegan reached into the cooler for the beer he saw that defendant was pointing a pistol directly at him. David Wright, a customer, and Richard Schwab, an insurance salesman who entered the bar at this moment, were ordered to lie down on the floor at the back of the barroom. Defendant then ordered Finnegan to deliver all the money in the bar's cash register.

The cash register had two drawers and after Finnegan had emptied the contents of one of them (amounting to about $150) into a cloth bank bag, defendant asked, "How about the other drawer on the register?" Upon being satisfied that the second drawer was empty defendant took the bank bag, ordered Finnegan to lie down near the other men, told them not to move or he would shoot them and backed out of the front door.

Defendant had been driven to the bar by Arlin Damion, a friend who remained in the car during the robbery. When defendant emerged from the bar and entered the vehicle on the passenger's side of the front seat, Damion drove away.

Shortly after midnight Deputy Sheriff George O'Neal received a radio broadcast advising that the Hub Bar had just been robbed. He immediately drove his patrol car three-tenths of a mile to an intersection 1.2 miles from the bar. He knew that this intersection was on a route frequently used by robbers in making escapes from the general area. Just as he reached the intersection he saw an approaching car with two men who appeared to be of Mexican descent. The car approached from the direction of the bar and was the only vehicle in sight. The deputy followed the car and was then advised by radio that the suspect was a "male Mexican." After further radio communication the deputy activated the red light and siren of the police vehicle and the suspects eventually stopped their vehicle.

The deputy halted his patrol car about 15 to 18 feet behind the suspects' car, stepped out and shouted to the two men to put their hands out of the car windows. Neither suspect responded to the demand; the deputy thereupon reached for his shotgun. Damion opened the door on the driver's side

of his car and fled on foot into an open field. Defendant, however, did not respond to the officer's further demands.

A second deputy sheriff, Kenneth B. Royal, arrived in his patrol car. Royal drew his service revolver and walked toward the suspects' car on the driver's side. O'Neal heard shots fired and saw Royal fall to the ground. Defendant emerged from the car on the passenger's side with a gun in his hand. O'Neal fired his shotgun at defendant. Defendant fell to the ground and then arose. Royal fired his revolver, and O'Neal fired his shotgun a second time. Defendant again fell to the ground, but once more got up and continued down the road away from the deputies. Defendant fell to the ground again and was then apprehended by another officer who had arrived at the scene. Royal died of a single gunshot wound in the neck.

Finnegan and Schwab testified that defendant did not sway, stagger, slur his words, or in any other way appear to be drunk. Defendant, on the other hand, testified that he was "pretty well drunk" on the night of the killing. He claimed that after Damion fled from the car he saw a police officer with a gun pointed at his face and that he saw a flame from the officer's gun and felt something hot on his face. He further claimed that he did not recall shooting his gun and that he did not intend to shoot the officer. He admitted that he committed the robbery, and he had a clear recollection of most of the details of that crime.

Evidence was received in behalf of defendant disclosing that a blood sample taken from him at 2:50 a.m. on the morning of the homicide had a blood alcohol content of .23 percent. A criminologist testified that the judgment and memory of a person with a blood alcohol level of about .25 percent would be impaired.

Defendant also called a psychiatrist who had examined defendant in the Sacramento County jail five weeks after the homicide. The phychiatrist testified that defendant's mental capacity had been reduced by his intoxicated state to the extent that "there is considerable doubt that he had sufficient capacity to premediate and deliberate" at the time of the crimes.

Defendant's various contentions of trial error and further factual matters specifically related thereto will be individually examined in the order of their claimed occurrences. ■ He first contends that the trial court committed prejudicial error in granting a motion by Damion, who was jointly charged with defendant, for a separate trial. Defendant claims that he was prejudiced because he was deprived of Damion's testimony when the latter refused to testify on the ground of self-incrimination at defendant's trial. At that time Damion's trial had not taken place. In *People* v.

*Massie* (1967) 66 Cal.2d 899, 916-917 [59 Cal.Rptr. 733, 428 P.2d 869], we noted that the more recent cases hold that the trial court should separate codefendants for purposes of trial where there is a "possibility that at a separate trial a codefendant would give exonerating testimony." At the time of the motion for separate trials there was evidence before the court that defendant had made statements exonerating Damion. The trial court ordered separate trials specifically because "Damion would, in a joint trial, be deprived of exculpatory testimony by [defendant] . . . [because] there would be no way in which Damion could compel this testimony during the trial."

Defendant argues that he was deprived of his "right under due process of law to have all necessary witnesses to testify in his own defense." However, if he had been jointly tried with Damion, he would not have had the "right" to Damion's testimony, in that Damion could have refused to take the witness stand. (See, e.g., *Bruton* v. *United States,* 391 U.S. 123, 127-128, 136 [20 L.Ed.2d 476, 480-481, 485, 88 S.Ct. 1620].)

It should be noted, also, that defendant did not at any time prior to his motion for new trial make any objection to Damion's motion for separate trials, the order granting separate trials, or the order setting Damion's trial after that of defendant. At the time the motion for a new trial was heard, defense counsel acknowledged that he had not, at the time of the motion or order for separate trials, requested a later trial date. He also stated at the hearing on the motion for a new trial that he did not know whether Damion's testimony would be favorable to his client; and on appeal he does not claim to have such knowledge. He thus fails to demonstrate not only error but also any prejudice suffered by the granting of the motion for separate trials.

Defendant next claims error in the denial of his motion for change of venue because of the nature of pretrial publicity. In *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383-384 [66 Cal.Rptr. 724, 438 P.2d 372], we held that a motion for change of venue or continuance must be granted whenever it is determined that due to the dissemination of potentially prejudicial material there is a reasonable likelihood that a fair trial cannot be had in the absence of such relief. We also held in *Maine* that consistent with *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507], appellate courts must make an independent evaluation of the evidence to determine whether a defendant has obtained a fair and impartial trial. (68 Cal.2d at p. 382; see also *People* v. *O'Brien* (1969) 71 Cal.2d 394, 400 [78 Cal.Rptr. 202, 455 P.2d 138, 456 P.2d 969].) Our independent review of the evidence in the instant case indicates

that defendant received a fair and impartial trial under the standard of "reasonable likelihood" set forth in *Maine*.

In *Maine* we considered such factors as the nature, frequency and timing of the publicity; evidence of continued community interest; the limited size of the community in which the crime occurred; and the standings of the victim and the accused in the community. In the present case, the bulk of the news stories concerned the circumstances of the arrest, including details as to the pursuit and the use of weapons. It is doubtful that anyone reading or listening to such stories would recall the details; the stories do not have the kind of intrinsic impact that reports of a confession would have. (Cf. 68 Cal.2d at p. 386.)[2]

With respect to the frequency and currency of reports, most of the reports by the news media appeared on June 7, 1968, the day of the crime. The only mention of defendant's case thereafter consisted of a one-minute film on the victim's funeral telecasted at two different times on June 11; a June 12 news article on the funeral, including a photograph and a brief caption; two brief newspaper reports, one on July 8 and the other on July 16, relating that the Southside Park and Recreation District planned to name a park after Deputy Royal;[3] a short letter from a friend of Royal, lauding him, published as a letter to the editor in a newspaper on June 17; and a July 26 newspaper report that Damion was seeking dismissal of the charges against him and that defendant did not plan to challenge the indictment. By the time the trial began on September 16, 1968, no report had appeared in the news media for nearly two months. In short, the interest of the news media in the case had disappeared.

It further appears that the cause in the instant case arose in Sacramento County, which has a population more than 12 times that of Mendocino County, the county involved in *Maine*. (See *Whittaker* v. *Superior Court* (1968) 68 Cal.2d 357, 373, Appendix A [66 Cal.Rptr. 710, 438 P.2d 358]; *Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 385-386.)

Finally, and most importantly, the jurors' ignorance of the pretrial publicity is a very strong indication that defendant was not tried by a biased jury. (*People* v. *Tahl,* 65 Cal.2d 719, 731 [56 Cal.Rptr. 318, 423

---

[2]Defendant complains that the shooting of Deputy Royal was related to the shooting of Senator Kennedy (who had died on June 6, the day before Royal died) in a televised interview with Sacramento County Sheriff John Misterly. However, the interviewer asked only one very brief question on this point and the record clearly indicates that none of the jurors was aware of the remark.

[3]It should be noted that the trial judge, upon ruling on defendant's motion for change of venue, stated that he would not permit the dedication of the park to be held during or about the time of the trial.

P.2d 246].) Eight of the twelve jurors did not recall reading or hearing about the case and the recollection of the remaining four was so dim as to be negligible.[4]

■ It is clear from our examination of the record that the jury was not influenced by any of the pretrial publicity and that defendant was not deprived of a fair and impartial trial by reason thereof. The motion for change of venue was properly denied.

Defendant next contends that the trial court improperly received in evidence a color photograph of the deceased deputy. Photographs of a victim of a crime are generally admissible if their probative value outweighs any inflammatory effect. This determination is ordinarily within the sound discretion of the trial court. (*People* v. *Nye* (1969) 71 Cal.2d 356, 369-370 [78 Cal.Rptr. 467, 455 P.2d 395]; *People* v. *Goodridge* (1969) 70 Cal.2d 824, 836 [76 Cal.Rptr. 421, 452 P.2d 637].) In the present case, after careful consideration of a total of 20 photographs outside the presence of the jury, the trial judge allowed the prosecution to introduce only one photograph of a closeup of the deceased's wound and another showing the location of the fatal wound in a full body view. Defense counsel objected to the introduction of the latter photograph. ■ That photograph, however, clearly had probative value in that it showed the location of the wound in relation to the deceased's body and aided the jury in understanding the testimony of Dr. Pierce Rooney, the autopsy surgeon. (See *People* v. *Talbot* (1966) 64 Cal.2d 691, 708 [51 Cal.Rptr. 417, 414 P.2d 633], overruled on other grounds in *People* v. *Ireland*

---

[4]The pertinent statements of the four jurors were as follows: Mr. Reed stated that after the *voir dire* questioning of the preceding day, he did recall reading of the case, but that was about all he recalled; that he could recall only that a deputy was shot and there was an attempted robbery; that he did not recollect any of the facts with respect to the shooting incident or anything around it; that he could fairly base his decision only upon the evidence he was to hear in the case; and that he had formed no tentative opinion as to defendant's guilt or innocence based on what he had read.

Mr. Foster stated: "I remember vaguely reading a newspaper article where someone —someone in a barroom was killed during a robbery. I feel sure it's the same one, but it's very vague." He then said that he had formed no tentative opinion with respect to defendant's guilt or innocence based upon what he had read and that he would base his verdict solely on the evidence he was to hear in the courtroom.

Mrs. Severance stated that she could recall an incident in June which could pertain to the case but that she was not positive; that she could not recall whether the incident occurred in Sacramento and did not know whether it pertained to the same case; that she did not pay much attention to the details of the case; and that there was nothing which might influence her deliberations.

Mr. Miller stated that he could "just vaguely" recall reading about the case in the paper; that nothing he had read would influence his deliberations; that he had formed no conclusion or preliminary opinions with respect to the case; and that he had a completely open mind about the evidence and what it might show.

(1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) The instant case clearly differs from *People* v. *Redston* (1956) 139 Cal.App.2d 485, 490-491 [293 P.2d 880], and *People* v. *Burns* (1952) 109 Cal.App.2d 524, 541-542 [241 P.2d 308, 242 P.2d 9], cited by defendant, wherein it was held improper to receive into evidence photographs having no probative value which showed the deceased with a shaved head and horribly disfigured by an autopsy. The claimed error was thus without merit.

We deal next with defendant's contention that, as a matter of law, the robbery had been completed prior to the time of and at a different place than the killing; that the homicide therefore could not have been committed in the course of the robbery within the felony-murder rule and that the trial court erred in instructing the jury on such rule. Defendant further contends that, even assuming that instructions on the felony-murder rule were appropriate, it was error for the court to refuse to define the term "scrambling possession" as applied to the proceeds of the robbery when requested to do so by the jury.

Section 189, which establishes the limits of the felony-first-degree-murder rule, provides that all "murder . . . which is committed in the perpetration of, or attempt to perpetrate . . . robbery . . . is murder of the first degree; . . ." Our particular concern is whether the killing of the deputy after defendant had been stopped while fleeing from the scene of the robbery, was a killing in the "perpetration" of the robbery. The trial court gave four instructions which we have numbered and set forth in the margin concerning the time within which a robbery is still in progress for purposes of application of the felony-murder rule.[5]

---

[5] (1) "A robbery is still in commission while the perpetrator is being pursued immediately after the commission of the act of taking the property of another by force or fear with the fruits of the crime in his possession so long as the culprit has not won his way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession."

(2) "A robbery is still in commission during the continuous, integrated attempt to successfully leave with the loot."

(3) "If the robbery has been completed and terminated prior to the killing, then the robbery may not be used to find the defendant guilty of murder of the first degree. Whether the killing was committed during the perpetration of the robbery must be decided by the jury.

"A robbery is still being committed, no matter how far from the scene of the robbery, nor how long afterward, if the robber has not won his way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession." (This instruction was given at defendant's request.)

(4) "If the robbery has been completed and terminated prior to the killing then the robbery may not be used to find the defendant guilty of the murder of the first degree. On the other hand, the unlawful killing of a human being which is committed in the perpetration or attempt to perpetrate robbery, the commission of which crime itself

After retiring to deliberate, the jury returned to the court requesting further instructions on murder in the first degree, murder in the second degree, and the law applying to "zone of danger," that is, how long a felony continues in progress. Included in the instructions read by the court pursuant to the request were the four instructions heretofore quoted. Some of them, after questions by the jurors, were read more than once. Two jurors requested that the court define "scrambling." The court, after saying that the dictionary definition would not help and that the jurors should consider the word in the context of a person fleeing from the scene of a robbery with the plunder, reread instruction set forth in footnote 5, *supra*, enumerated (1). Approximately two hours later, the jury again returned and a juror asked the court to reread the instructions in connection with whether the robbery was in progress. The court read the instructions designated as (1) through (4) in footnote 5 several times enabling the jurors to write them down. The jury deliberated for a little more than an hour before retiring for the night and returned its verdict shortly after reconvening the following morning.

Instructions (1) and (3) appear to require that the jury find *both* that the robber did not win his way to a "place of temporary safety" *and* that his possession of the plunder was no more than a "scrambling possession" before it could find that the robbery was still in progress. Instruction (1) further requires pursuit "immediately" after the physical taking of the property. Instructions (2) and (4), on the other hand, appear to require that the jury find only that the robber did not win his way to a "place of temporary safety"—that is, that the robber was still attempting to escape —to find that the robbery was still in progress.

The phrases "place of temporary safety" and "scrambling possession" are derived from the landmark case of *People* v. *Boss* (1930) 210 Cal. 245 [290 P. 881]. In that case two defendants robbed a store and ran into the street; an employee immediately pursued them and was shot by Boss a moment later when the furthermost defendant was no more than 125 feet from the store. We held that the trial court properly instructed

must be proved beyond a reasonable doubt, is murder of the first degree whether the killing was intentional, unintentional or even accidental.

"Whether the killing was committed during the perpetration of robbery must be decided by the jury.

"A robbery is still being committed no matter how far from the scene of the robbery nor how long afterward if the robber has not won his way, even momentarily, to a place of temporary safety. That is to say, that a robbery is not completed at the moment the robber obtains possession of the stolen property, but is still in progress during the robber's attempt to escape with the loot. In other words, the escape of the robbers with the loot is a part of the robbery itself." (This instruction was given at the request of the prosecution.)

the jury as to first degree felony murder as the homicide was committed in the perpetration of a robbery and we stated: "It is a sound principle of law which inheres in common reason that where two or more persons engage in a conspiracy to commit robbery and an officer or citizen is murdered while in immediate pursuit of one of their number who is fleeing from the scene of the crime with the fruits thereof in his possession, or in the possession of a co-conspirator, the crime is not complete in the purview of the law, inasmuch as said conspirators have not won their way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession. In such a case the continuation of the use of arms which was necessary to aid the felon in reducing the property to possession is necessary to protect him in its possession and in making good his escape. Robbery, unlike burglary is not confined to a fixed *locus,* but is frequently spread over considerable distance and varying periods of time. The escape of the robbers with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property. Without revolvers to terrify, or, if occasion requires, to kill any person who attempts to apprehend them at the time of or immediately upon gaining possession of said property, their plan would be childlike. The defense of felonious possession which is challenged immediately upon the forcible taking is a part of the plan of robbery, or as the books express it, it is *res gestae* of the crime." (Pp. 250-251 [4].)

The court in *Boss* thus maintained that the robbery was not complete, as the robbers had not won their way to a "place of temporary safety" and their possession of the plunder was no more than a "scrambling possession." The meaning of the two phrases is not made entirely clear. The fact that a robber has not won his way to a "place of temporary safety" can only mean that he is still fleeing, still trying to escape. If the phrase "scrambling possession" is not to be treated as merely redundant, it means that the robber is being immediately pursued and his felonious possession of the loot is being challenged "immediately upon the forcible taking."

The great majority of felony-murder rule cases involving robbery as the underlying felony decided by this court since *Boss* involve fact situations with both elements, continuous flight (lack of a "place of temporary safety") and continuous challenging pursuit ("scrambling possession") and generally set forth the language of *Boss* without further analysis. Thus these cases do little to clarify the question whether *both* elements are required for a robbery to be considered continuing for purposes of the felony-murder rule.

In *People* v. *Kendrick* (1961) 56 Cal.2d 71 [14 Cal.Rptr. 13, 363 P.2d 13], however, the element of "scrambling possession" was clearly missing. It was nevertheless held in that case that instructions on the felony-murder rule were properly given when the killing occurred about 48 minutes after the robbery victim had first been accosted by the defendant and when the police officer who was fatally shot by the defendant had apparently stopped him for a traffic violation and had no information about the robbery. We ignored the language in *Boss* concerning "place of temporary safety" and "scrambling possession" and quoted that part of *Boss* which stresses the importance of "[t]he escape . . . with the loot . . . to the execution of the plan," stating, "The homicide, committed as it was while defendant was in hot flight with the stolen property and in the belief that the officer was about to arrest him for the robbery, falls well within this rule." (P. 90.) Although not expressly so described, the "rule" as applied in *Kendrick* required only the element of the defendant's failure to have reached a "place of temporary safety."

*People* v. *Ketchel* (1963) 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394] involved a fact situation with both elements present: "place of temporary safety" and "scrambling possession." Defendants attempted to bring themselves within *Boss* and relied upon the language in that case which spoke of both "a place of temporary safety" and "scrambling possession." In rejecting their contention we relied only upon facts which established that the defendants had not reached a place of temporary safety and ignored the element of scrambling possession. (P. 524.) That case like *Kendrick* must stand for the proposition that a fleeing robber's failure to reach a place of temporary safety is alone sufficient to establish the continuity of the robbery within the felony-murder rule.

In the present case as in *Ketchel,* the homicide was committed before defendant had reached a place of safety while he "was in hot flight with the stolen property and in the belief that the officer was about to arrest him for the robbery." Deputy O'Neal commenced to follow defendant's vehicle within three minutes of the time defendant left the bar and the killing occurred within six or seven minutes of that time. Thus the robbery was still in the escape stage, as conceded by defendant at trial. Defendant testified not only that he was caught while attempting to escape with the loot, but also that he did not know whether he would split the loot with Damion as they had had no opportunity to make that determination.

Under the circumstances here present and even if the killing were accidental or unintentional as contended by defendant, it occurred while the robbery continued in progress and constituted first degree murder under

the felony-murder rule. ■ Although the introduction in the instructions to the jury of concepts of immediate pursuit together with scrambling possession and the court's refusal to define "scrambling possession" may have been erroneous, no prejudice resulted to defendant as in any event the jurors were compelled to find that the homicide was committed before defendant had reached a place of safety. The introduction of the pursuit and scrambling concepts did in fact confer benefits to which defendant was not entitled.

Defendant's final contention meriting discussion, aside from attacks on the death penalty or penalty trial, is that there is no substantial evidence that he acted with premeditation and malice aforethought. More specifically he argues (1) that there is no evidence to rebut his own testimony that he had been struck by a bullet from Deputy Royal's gun and fired his own gun unconsciously in response, and (2) that "[t]here was uncontradicted evidence that defendant was intoxicated to a degree which placed him in the area of 'mental confusion' . . . ."

In *People* v. *Robillard* (1960) 55 Cal.2d 88, 93-96 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], we upheld instructions on premeditation and deliberation on the basis of circumstantial evidence where a felon faced with apprehension killed a police officer. In the present case, as in *Robillard,* the activities of defendant prior to the actual killing and the existence of an apparent motive to kill the police officer both provide strong circumstantial evidence of premeditation and deliberation. (Cf. *People* v. *Anderson,* 70 Cal.2d 15, 26-27 [8] [73 Cal.Rptr. 550, 447 P.2d 942].)

The uncontradicted evidence shows that defendant brandished a gun while robbing the bar. ■ The victims of the robbery testified that defendant, after ordering them to lie on the floor, warned them not to try to get up or he would "blow [their] heads off." This evidence of defendant's actions prior to the actual killing strongly indicates that he intended to kill if necessary to prevent his apprehension.

At the time of the killing defendant was fleeing from the scene of the robbery. He refused to comply with Deputy O'Neal's orders to get out of the car and, the evidence disclosed, hid the bank bag containing money under the front seat of the vehicle while Deputy Royal was approaching. When Royal approached the driver's door of the car defendant shot him. Under the circumstances the trier of fact could reasonably have rejected defendant's version of how he had killed the deputy, could reasonably have inferred that defendant from the beginning planned to kill anyone interfering with the successful perpetration of the robbery and could

reasonably conclude that defendant killed Royal in accordance with that plan with the purpose of avoiding apprehension and a long prison term.

In aid of the implied findings and contrary to defendant's claim, the evidence indicates that he was not hit in the head or anywhere else by a bullet fired by Royal as defendant's wounds resulted from buckshot only. O'Neal was armed with a shotgun, while Royal was armed with a .38 caliber revolver at the time of the shooting. O'Neal testified that he did not fire his shotgun until after defendant shot Royal. Thus the trier of fact may well have rejected defendant's version that he unconsciously fired in response to being struck by a bullet from Royal's gun.

Also contrary to defendant's further claim his evidence that due to intoxication he lacked the capacity to deliberate and premeditate was not uncontradicted. The criminologist who testified that the judgment and memory of persons with a blood alcohol level of about .25 percent would be altered, also testified on cross-examination that the extent to which a person's judgment and reasoning ability would be impaired at this level is dependent on many factors and varies widely among different persons; that a heavy drinker (as defendant admittedly was) is able to control the symptoms of intoxication better than a non-drinker and that it would be possible for some persons to form the intent to kill and carry out this intent at a .25 percent level. The psychiatrist called by defendant concluded only that, because of his intoxicated state, defendant's mental capacity was reduced to the extent that *"there is considerable doubt* that he had sufficient capacity to premeditate and deliberate." (Italics added.)

In the face of the above inconclusive evidence offered by defendant's witnesses, there was testimony by the robbery victims, one of whom was a bartender, that defendant did not sway, stagger, slur his words, appear flushed, or in any other way appear to be drunk. He was well enough oriented to insist that both drawers of the cash register be examined for currency, and his other actions in connection with the robbery were those of a person in full possession of his faculties. It was for the trier of fact to resolve the conflict in the evidence as to whether defendant was in fact so intoxicated as to be unable to premeditate and deliberate and the record substantially supports the implied findings in favor of the judgment.

Defendant's various attacks upon the propriety of the penalty trial proceedings are rendered moot by our decision in *People* v. *Anderson, supra,* 6 Cal.3d 628, holding that the death penalty may not be constitutionally imposed.

The judgment, insofar as it provides for the penalty of death, is modified

to provide in place of the death penalty a punishment of life imprisonment and as so modified is affirmed in all other respects.

Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the judgment.

PETERS, J.—I dissent.

The majority have extended the felony-murder rule and repudiated in part the landmark decision in *People* v. *Boss* (1930) 210 Cal. 245 [290 P. 881]. I would adhere to the decision in *Boss,* and when this is done, it is clear that prejudicial error occurred in instructing the jury on the felony-murder doctrine thus requiring reversal of the judgment.

Section 189 of the Penal Code, which establishes the felony-first-degree-murder rule, provides that all "murder . . . which is committed in the perpetration of, or attempt to perpetrate . . . robbery . . . is murder of the first degree; . . ."

Section 211 of the Penal Code defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

A literal reading of the sections, in light of the requirement of commission in the perpetration of the robbery and in light of the definition of robbery, would mean that the homicide must occur during the taking of the property and prior to the termination of the force and fear by which the taking was accomplished.

However, this court rejected a literal construction of the two statutes in *People* v. *Boss, supra,* 210 Cal. 245, and established a broader rule for determining whether a homicide occurred in the perpetration of the robbery or after its termination. In expanding the operation of the felony-murder rule in the robbery situation, the court in *Boss* established two limitations on the continuation of the robbery. Today, the majority repudiate one of the limitations and to that extent overrule *Boss.* I cannot agree with the further expansion of the felony-murder doctrine.

*People* v. *Boss, supra,* 210 Cal. 245, involved two defendants who robbed a store and ran into the street; an employee immediately pursued

them and was shot by Boss a moment later when the furthermost defendant was not more than 125 feet from the store. (*Id.* at pp. 247-248.) In holding that the trial court properly instructed the jury as to first degree felony murder because the homicide was committed in the perpetration of the robbery, this court stated: "It is a sound principle of law which inheres in common reason that where two or more persons engage in a conspiracy to commit robbery and an officer or citizen is murdered while in immediate pursuit of one of their number who is fleeing from the scene of the crime with the fruits thereof in his possession, or in the possession of a co-conspirator, the crime is not complete in the purview of the law, inasmuch as said conspirators have not won their way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession. In such a case the continuation of the use of arms which was necessary to aid the felon in reducing the property to possession is necessary to protect him in its possession and in making good his escape. Robbery, unlike burglary is not confined to a fixed *locus*, but is frequently spread over considerable distance and varying periods of time. The escape of the robbers with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property. Without revolvers to terrify, or, if occasion requires, to kill any person who attempts to apprehend them at the time of or immediately upon gaining possession of said property, their plan would be childlike. The defense of felonious possession which is challenged immediately upon the forcible taking is a part of the plan of robbery, or as the books express it, it is *res gestae* of the crime." (*Id.* at pp. 250-251.)

The court thus established two requirements to establish that the robbery was not complete. First, there must be "immediate pursuit" which means that the possession is merely a "scrambling possession." This limitation finds some support in the language of the robbery statute because, so long as there is "immediate pursuit" and a mere "scrambling possession," it can be argued that the "taking" of the property is not complete because it is being physically disputed. Second, the robbers must not have reached "a place of temporary safety."

The majority today recognize but repudiate the first limitation, holding that the sole test is a place of temporary safety. In doing so, the majority rely upon *People* v. *Ketchel*, 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394], and *People* v. *Kendrick*, 56 Cal.2d 71 [14 Cal.Rptr. 13, 363 P.2d 13]. *Ketchel*, however, on its facts involved a homicide which occurred within both limitations. There was immediate pursuit with the resulting mere scrambling possession, and the robbers had not reached a place of temporary safety. Although the court spoke only of the failure to reach a

place of temporary safety in connection with the defendants' contention, this was because the defendants' contention was based on the temporary-safety language in *Boss*. There was no intent to depart from the immediate pursuit and scrambling possession limitation; the court in fact quoted that limitation from *Boss*. (59 Cal.2d at p. 524.) Moreover, in the subsequent case of *People* v. *Ford*, 65 Cal.2d 41, 55-57 [52 Cal.Rptr. 228, 416 P.2d 132], we again reiterated both of the limitations set forth in *Boss*.

It is true that in *Kendrick* there was no immediate pursuit or scrambling possession and that the court, although citing and relying upon *Boss*, merely relied upon the failure of the robber to reach a point of temporary safety in upholding instructions on the felony-murder rule. However, I do not believe that *Kendrick* may be viewed as substantial authority warranting repudiation of the limitation of immediate pursuit and scrambling possession and of *Boss* and the numerous cases which have followed it. The defendant in that case urged that the homicide was too distant in time and place to classify it as having occurred during perpetration of the robbery. So far as appears, the defendant did not rely on the limitation of immediate pursuit and scrambling possession, and in answering the specific contention of defendant, it was proper to point out that *Boss* had established a rule which meant that it was not determinative that the homicide occurred some distance from the robbery and sometime later. Under the circumstances, it seems improper to hold that the court intended to repudiate one of the requirements of *Boss*, the case which was quoted from and principally relied upon.

Apart from their reliance on *Ketchel* and *Kendrick*, the majority give no reason to repudiate the first limitation of *Boss*, and in my view, those cases provide a weak foundation for the majority's action. There are several reasons why we should adhere to the first limitation in *Boss* and not further extend the felony-murder rule.

The felony-murder doctrine ascribes malice aforethought to the felon who kills in the perpetration of an inherently dangerous felony and classifies the offense as murder of the first degree in homicides which are the direct result of those six felonies enumerated in section 189 of the Penal Code. (*People* v. *Ireland*, 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) Although section 189 speaks only of degrees of "murder," inadvertent or accidental killings are first degree murders when committed by felons in the perpetration of robbery, and the purpose of the rule is to deter felons from negligently or accidentally killing by holding them strictly responsible for killings they commit. (*People* v. *Washington*, 62 Cal.2d 777, 780-781 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Coefield*, 37 Cal.2d 865, 868 [236 P.2d 570].)

"The felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability." (*People* v. *Washington, supra,* 62 Cal.2d 777, 783, and authorities cited; see also *People* v. *Wilson,* 1 Cal.3d 431, 440 [82 Cal.Rptr. 494, 462 P.2d 22]; *People* v. *Ireland, supra,* 70 Cal.2d 522, 539.) The rule has been abolished in England where it had its origin (English Homicide Act, § 1, 1957, 5 & 6 Eliz. II, ch. 11). We have recently pointed out that the rule "expresses a highly artificial concept that deserves no extension beyond its required application." (*People* v. *Phillips,* 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353].) Although the rule remains the law in this state, I do not believe we should extend its applicability by broadly defining the term robbery; instead in furtherance of the policy to equate criminal liability with culpability we should strictly limit the meaning of the term robbery as used in section 189.

To extend the felony-murder rule until the robber has reached a place of temporary safety, without regard to whether the decedent is a victim or witness of the crime and without regard to whether there has been a break in the pursuit, would mean that the death of victims of automobile collisions or of pedestrians occurring accidentally during an escape may constitute first degree murder. In the absence of a direct pursuit by victims or witnesses, such a broad application of the first degree felony-murder rule to accidental killings is not in accord with the purpose of the rule or the language of the statutes.

Once we depart from the literal definition of robbery in section 211 of the Penal Code, any test that might be used to determine whether a robbery is complete for purposes of the felony-murder rule is necessarily arbitrary. The place of temporary safety, or continuous flight, test is not directly related either to the increased foreseeable danger caused by the robbery or to the robber's motive in seeking to escape detection. The increased risk of a killing occurring due to the commission of the robbery continues long after the robber reaches a place of temporary safety for he will continue to have the motive to kill to escape apprehension. In other words, the risk of injury or death to investigating officers seeking to apprehend the criminal may relate to whether the robber has the loot, is armed, or anticipates conviction, but it bears little relationship to whether the robber has reached a place of temporary safety.

A test based solely on place of temporary safety makes the *length* of the escape route the decisive consideration. If the robber leaves the scene of the robbery and reaches his hideout or home near the scene, the felony-

murder rule is inapplicable under the place-of-temporary-safety test whether he is armed or still in possession of the loot, but if he must cross the city to his hideout and the homicide occurs prior to his doing so, the test would make the felony-murder rule applicable although the robber was not armed, he had lost or disposed of the loot, a pedestrian was killed, and the homicide occurred a substantial time after the taking of the property and the termination of the force and fear incident to it.

Finally, the place of temporary safety limitation finds no support in the language of the relevant statutes.

On the other hand, the limitation to immediate pursuit and scrambling possession, as we have seen, finds some support in the definition of robbery in section 211 of the Penal Code. Although this court may refuse to adhere to the literal wording of the statute as was done in *Boss* and the cases following it, we should not ignore the terms of the statute entirely. Where there is immediate pursuit by victims or witnesses of the taking or of the force and fear used in the robbery, the risk of injury or death is greatly increased, and it is not the same risk as exists with regard to apprehension occurring subsequent to the taking.

Of course, if the killing of an officer seeking to apprehend a felon is premeditated and with malice aforethought it is first degree murder (Pen. Code, § § 187, 189), and we may expect that the jury will so find. However, my view is that an accidental killing of a person seeking to apprehend the defendant should not be elevated to first degree murder merely because the felon had not reached a place of temporary safety, where the decedent was not a victim or witness of the robbery and where there was a break in the pursuit.

Accordingly, I would not repudiate either of the limitations established in *Boss* and the cases which have followed it.

As the majority point out, the evidence in the instant case is sufficient to warrant a finding of first degree murder on a theory of premeditation. The evidence also shows that the decedent was not the victim of the robbery or a witness to it and that there was a break in the pursuit. In my view, it was proper to submit the case to the jury on a theory of premeditation, but it was error to submit the case to the jury on the felony-murder theory. Defendant denied that he intended to kill decedent, and, if the jury were satisfied that the killing was inadvertent or unintentional, it should not have found him guilty of murder in the first degree. The felony-murder instructions, however, permitted a finding of first degree murder even if

the shooting was inadvertent or unintentional, and in view of the jury's express concern with the felony-murder instructions, the error must be held prejudicial.

I would reverse the judgment.