[No. D038761. Fourth Dist., Div. One. Apr. 4, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
COBY J. PORTILLO, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

R. Clayton Seaman, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, James D. Dutton and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—A jury convicted Coby J. Portillo of first degree murder (Pen. Code,[2] § 187, subd. (a)), forcible rape (§ 261, subd. (a)(2)), and forcible sodomy (§ 286, subd. (c)(2)). The jury also found true allegations that Portillo had used a deadly weapon, a hammer, in committing the murder (§ 12022, subd. (b)(1)), and that he had committed the murder during the commission or attempted commission of rape and sodomy, both special circumstances (§ 190.2, subd. (a)(17)). The trial court sentenced Portillo to life in prison without the possibility of parole, plus a consecutive one year for the deadly weapon use enhancement.

Portillo appeals, contending the trial court prejudicially erred in expanding the scope of felony-murder sex offenses to include a homicide that occurred after the sex offenses were complete, but before the defendant reached a place of temporary safety. Alternatively, Portillo asserts that if felony-murder rape and sodomy include the "escape rule," then the felony-murder special circumstances regarding rape and sodomy must be set aside as constitutionally defective because they merely duplicate the crime of felony murder for those underlying offenses. In addition, Portillo claims the trial court violated his federal constitutional rights by instructing with CALJIC No. 17.41.1. We affirm.

### FACTUAL SUMMARY[3]

During the summer of 2000, Portillo was a petty officer in the United States Navy stationed aboard the U.S.S. Ogden in San Diego. Due to the stress level aboard the ship, Portillo often talked with other seamen and petty officers about picking up a prostitute, raping her and then killing her. On August 25, 2000, Portillo said that when he killed a prostitute he would put her body in a seabag, which is a round, green duffel bag issued to Navy personnel. None of the other men reported his statements because they thought he was joking.

On August 27, 2000, Portillo, who lived with his wife off base in an apartment, called a professional escort service that provides strippers and nude entertainers, after he had taken his wife to work. Using a different name, he requested an "Asian girl," and offered to pay cash. The receptionist described the availability of a petite Asian escort who used the name

---

[2]All statutory references are to the Penal Code unless otherwise specified.

[3]Because Portillo does not challenge the sufficiency of the evidence to support his convictions and true findings, we merely summarize the relevant facts as background for our discussion of his contentions.

"Monica." In agreement, Portillo gave the receptionist his telephone number and the apartment number of his neighbor who lived directly below him.

Monica, a 36-year-old licensed escort and mother of two whose real name was Natividad W. (Nancy), was given the assignment by the agency in response to Portillo's call. Less than five feet tall, Nancy was "security conscious," carried a stun gun, and was known to strictly follow the agency's procedures of collecting money up front and phoning in to verify receiving the funds before rendering any services. In over 100 calls for the agency, Nancy had never failed to phone in at the start of any service. When the receptionist gave Nancy the assignment, she gave her the address Portillo had given the agency and reminded her to call the office upon her arrival to the appointment.

When Nancy arrived at the given address around 2:00 p.m., the man answering the door told her he was not the person she was looking for. Shortly after she walked away, he heard muffled voices upstairs and "a loud thumping sound like somebody running across the floor."

Nancy never called into the agency that day and Portillo failed to pick up his wife from work at 3:15 p.m. as arranged. A coworker drove his wife home and she obtained a key from the apartment manager to enter their apartment around 6:30 p.m. When his wife entered the apartment, she saw blood on the floor near what appeared to be Portillo's seabag, an unknown pair of women's sandals in the hallway, a purse and cloth bag which did not belong to her near the dining room table, and a hammer with blood-like stains on it. She called 911.

When San Diego deputy sheriffs arrived, they found Nancy's body covered by two seabags, secured the area, and waited for homicide detectives. Before the homicide detectives arrived, Portillo drove up to the apartment complex in his truck. He was placed in a patrol car and later agreed to speak with the homicide detectives. Portillo initially denied any knowledge of why a body would be in his apartment, claiming he had gone to his ship around 2:00 p.m. to drop off some clothes, had watched some television in the ship's lounge and had fallen asleep. He had failed to pick his wife up at work because he did not wake up until around 7:45 p.m. Portillo could not identify anyone who saw him on the ship and explained that a fresh scratch on his face was caused by his wife's cat.

When the detectives again interviewed him that night, telling him they could not verify his alibi with the ship's personnel, Portillo continued to insist he was on the ship and did not know anything about what happened in

his apartment that day. He claimed bloodstains found on his shorts were his own blood. Several days later Portillo was again questioned for nearly two hours. He continued denying any knowledge of the murder, insisting he had fallen asleep on his ship. Portillo also denied knowing why a stun gun was found in a search of his truck. Eventually, Portillo changed his story, admitting he had called the escort service. When he saw from his apartment that the "escort" was leaving the address he had given the agency, he called out her name. He then had consensual sex with her, but did not know "what happened or how she died."

The subsequent investigation revealed that inside the seabag near Nancy's head were her pants with a broken zipper and torn underwear. Her bra was found pulled down underneath her breasts and her sweater pulled up, exposing them. An autopsy revealed she had sustained five blows to her head consistent with being hit by a hammer, and suffered broken bone and cartilage in her neck, petechiae hemorrhages in her eyes and eyelids, which are the "hallmarks of strangulation," two black eyes, bruises and lacerations on her lip, an abrasion on her left elbow, and blunt force injuries in her vaginal area and bruising around her anus. The medical examiner opined the cause of death was manual strangulation and multiple blunt force head injuries.

Further testing revealed that Nancy's blood was on Portillo's shorts, his carpet and the hammer in his apartment. Tests also showed that Portillo's DNA was in scrapings and clippings from her fingernails and his sperm was inside her vagina and around her anus.

Portillo was brought to trial for Nancy's rape, sodomy and murder, and the above evidence was presented in the prosecution case. In addition to Portillo testifying in his own defense, the defense presented evidence of his nonviolent character through the testimony of his mother and several seamen and officers who worked on the ship with him. A forensic pathologist who had reviewed crime scene photographs and the autopsy report opined that Nancy's neck injuries were consistent with manual strangulation or having fallen down with someone's hand around her throat. He also concluded that she had head injuries consistent with being hit with a fist and hammer, and that she had died within two to three minutes after receiving such injuries.

The gist of Portillo's defense was that the sex with Nancy was consensual and her killing was committed in self-defense. The statements he had made aboard ship regarding prostitutes were mere jokes to ease tensions on the ship. In the six months before the murder, he had often picked up prostitutes off the street to have sex in his truck. On the day of the murder, he called an escort service to "pull a little prank" because he was bored, "very horny,"

and considered escorts to be "basically high-class, paid prostitutes." He requested a "petite" girl be sent to the address of the apartment below his. He was on his balcony when the girl arrived downstairs. Noticing she was attractive, he decided to have sex with her and yelled for her when she was walking away. When she came upstairs, she came inside and agreed to have sex in addition to performing a nude dance if he would pay her additional money. When he offered her his credit card, she told him, "Don't worry about it right now. I trust you. I know you're in the military. I know you get paid." She told him she would call the agency "later on."

According to Portillo, after Nancy orally copulated him and had both vaginal and anal intercourse with him, he stopped any sexual activity when she complained it hurt. When he told her he did not have the money to pay her, she became angry and attacked him. In the process, she tore the underwear she was putting on. As they exchanged punches, Nancy threatened to kill him. When Portillo pushed her to the ground, she reached for an object from her bag and lunged at him. Thinking the object was a knife, Portillo grabbed a heavy hammer out of a box and "hit her like four, five times, just boom, real quick in the head." As she fell, she grabbed him and he fell on top of her with his hand on her neck, dropping the hammer on the floor nearby. He held her down as she started kicking and swinging at him. When she picked up the hammer to swing at him, he took it and threw it behind him. Nancy then "just like stopped." She was nonresponsive and not breathing.

Rather than attempt to revive her or call 911, he stuffed her body into two of his seabags and tied them together. He put the hammer back in the box, showered and changed shirts. When he left the apartment, he picked up Nancy's stun gun, the object he had thought was a knife, took it to his truck and drove away. He later drove back to the apartment to tell the police what had happened, but lied to them because he was scared and did not think they would listen. He claimed he did not try to kill Nancy, but only was trying to "knock her out" with the hammer in self-defense.

In rebuttal, the lead investigator for the prosecution testified there was only one area of struggle in the apartment where bloodstains, a clump of hair and an earring matching one in Nancy's ear were found on the carpet. There was no evidence of a struggle near the box containing the hammer or by Nancy's bags on the floor as described by Portillo. If there had been, the investigator would have expected Nancy to have "different sorts of injuries."

The jury did not believe Portillo's version of the events the day Nancy was murdered.

## DISCUSSION

## I

### *Felony-murder Escape Rule*

During jury instruction discussions, Portillo asserted there was insufficient evidence for the court to give felony-murder instructions as an alternate theory for first degree murder because they contemplated a continuous action, which he argued was not present in this case due to the completion of the underlying rape and sodomy offenses. The court overruled the objection, finding there was a sufficient evidentiary basis for such instruction. The court also overruled Portillo's objection to the giving of the felony-murder special-circumstance instructions based on rape and sodomy, finding sufficient evidentiary support. The court, however, sustained Portillo's objection to adding language to the felony-murder instructions based on the law regarding continuous action, commenting that there was a substantial difference from a robbery or burglary scenario to the rape and sodomy offenses charged here.

When the court subsequently instructed the jury on felony murder, it told the jurors that in order to find Portillo guilty under such theory, they had to find beyond a reasonable doubt he committed the murder "in the course of" rape or sodomy. During deliberations, the jury sent the court the following note: "We have a question about the term[s] 'commission' and 'in the course of' rape and sodomy. We were wondering about time frame, etc. [¶] legal definition of commission of rape as it is different from course of the rape. [¶] does the victim need to die while there *is* penetration or can the victim die after the crime[?] [¶] As to felony murder 1."

The court provided counsel with a copy of the note and its proposed response, and invited discussion. The prosecutor agreed with the court's response, noting she had anticipated such jury query due to "the dichotomy between the [instructions for the] special circumstance which talks about . . . the special [circumstance] appl[ying] whether it is committed during the commission of the crime or to facilitate the escape therefrom or to avoid detection. And that language is absent from the felony murder [instruction]." The prosecutor, however, requested the court include not only escape, but also the phrase "to avoid detection" in its answer to the jury. Portillo's counsel agreed the court's response was technically accurate, but argued the jury question only called for the court to answer "the difference between the commission of rape and how it's different from [in the] course of rape."

When the court differed, defense counsel argued the language regarding extending the crime of robbery and burglary for felony murder should not be applied to rape or sodomy which are unique crimes complete upon their commission. Upon further review of the case law, the court was satisfied with its response as modified to include the language suggested by the prosecutor. Over defense counsel's objection the court then sent the following response to the jury: " 'In the commission of' is synonymous with 'in the course of'. [¶] For the purposes of determining whether an unlawful killing has occurred during the commission or attempted commission of a forcible rape or sodomy by use of force, the commission of said crime (forcible rape or sodomy by use of force) is not confined to a fixed place or a limited period of time. Such crime is still in progress while a perpetrator is fleeing in an attempt to escape or to avoid detection. The crime is complete when the perpetrator has reached a place of temporary safety. [¶] The unlawful killing need not be simultaneous with the act of forcible penetration. However, it must be proven beyond any reasonable doubt that the unlawful killing occurred during the commission or attempted commission of a forcible rape or sodomy by use of force (as defined above), and that the death of the victim did not precede the commission or attempted commission of a forcible rape or sodomy by use of force."

After the jury returned its verdicts, Portillo brought a new trial motion on grounds there was insufficient evidence to support the verdicts and that the court's answer to the jury questions concerning first degree felony murder misdirected the jury on that theory. The court denied the motion, stating among other things, it was "satisfied that the jury was properly instructed as to all of the principles of law applicable to the charges and allegations of the information."

On appeal, Portillo contends the trial court prejudicially erred in essentially expanding the scope of felony-murder sex offenses to include a homicide that occurred after the sex offenses were complete, but before the defendant reached a place of temporary safety. He argues that the portion of the court's instruction telling the jury the underlying crimes of rape and sodomy continue for felony-murder purposes while the perpetrator attempts to escape or to avoid detection was wrong because the so-called "escape rule" only applies to theft offenses. We disagree.

Section 189, which defines first degree murder, provides in pertinent part: "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture,

or by any other kind of willful, deliberate, and premeditated killing, or *which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289,* or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree." (Italics added.)

█ The felony-murder doctrine, statutorily highlighted above, eliminates the requirements of malice and premeditation for first degree murder and provides that a killing is still murder of the first degree, whether intentional or unintentional, if it is committed in the perpetration of, or the attempt to perpetrate, certain serious felonies, including rape and sodomy as charged in this case. (§ 189; see generally *People v. Coefield* (1951) 37 Cal.2d 865, 868 [236 P.2d 570].) Such alternative theory to premeditated murder "was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker . . ." (*People v. Chavez* (1951) 37 Cal.2d 656, 669 [234 P.2d 632]), and "was not intended to relieve the wrongdoer from any probable consequences of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural." (*People v. Boss* (1930) 210 Cal. 245, 252-253 [290 P. 881].) Based on such intent and purpose, the established law of this state "has never required proof of a strict causal relationship between the felony and the homicide." (*Chavez, supra,* 37 Cal.2d at p. 669.) Thus it has been held that "[t]he homicide is committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction." (*Id.* at p. 670; see also *People v. Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People v. Thompson* (1990) 50 Cal.3d 134, 171 [266 Cal.Rptr. 309, 785 P.2d 857] (*Thompson*); *People v. Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783].)

Moreover, because flight following a felony has also been considered as part of the same transaction (*People v. Fuller* (1978) 86 Cal.App.3d 618, 623 [150 Cal.Rptr. 515], quoting *People v. Salas* (1972) 7 Cal.3d 812, 822 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]), it has generally been held that a felony continues for purposes of the felony-murder rule "until the criminal has reached a place of temporary safety." (*People v. Bigelow* (1984) 37 Cal.3d 731, 753 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723].)

After reviewing the above law, the court in *People v. Bodely* (1995) 32 Cal.App.4th 311 [38 Cal.Rptr.2d 72] found there was no reason to limit the so-called escape rule to the crime of robbery exclusively, as had been done in past California cases, because it was consistent with the "one continuous

transaction" test and furthered the " 'legitimate public policy considerations of deterrence and culpability' by extending felony-murder liability beyond the technical completion of the crime. [Citation.]" (*Id.* at pp. 313-314.) *Bodely* concluded "felony-murder liability continues during the escape of a burglar from the scene of the burglary until the burglar reaches a place of temporary safety." (*Id.* at p. 314.)

█  Even though we have found no reported felony-murder decision which has specifically applied the so-called escape rule to crimes other than robbery and burglary (*People v. Bodely, supra,* 32 Cal.App.4th at pp. 313-314),[4] we believe, as the trial court here did, that *Bodely* and the above felony-murder law support the court's answer given the jury in this case which essentially encompassed the "one continuous transaction" test for the felony sex offenses as the basis for the felony-murder theory as well as the language of the escape rule. As given, the instruction left open for the jury the question as to whether Portillo had reached a place of temporary safety cutting off felony-murder liability after raping and sodomizing his victim before killing her. Although it may appear illogical to attach such flight or escape language to a crime that is itself considered complete upon penetration, we do not believe the use of such escape principles are unreasonable or unnaturally extend the felony-murder rule beyond its established application of the "one continuous transaction" analysis used to define such theory based on underlying sexual offenses.

Numerous cases decided by our Supreme Court provide further support for the conclusion the instructional answer given by the trial court here was not an improper expansion of the scope of felony-murder sex offenses. In *People v. Jones* (2001) 25 Cal.4th 98 [104 Cal.Rptr.2d 753, 18 P.3d 674] (*Jones*), the high court in dealing with the interpretation of the language "in the commission" of for purposes of a firearm enhancement under sections 12022.3, subdivision (a), and 667.61, subdivision (e)(4), looked for guidance to the law defining felony murder. █  The court noted it had "long ago rejected the assumption 'that to bring a homicide within the terms of section 189 .. . . , the killing must have occurred "while committing," "while engaged in," or "in pursuance" of the named felonies, and that the killing must have been "a part of" the felony or attempted felony "in an actual and material sense." ' [Citation.] Thus, a murder may be determined to have been committed in the perpetration of a felony if it occurred after the felony, e.g., during the attempt to escape or for the purpose of preventing discovery of the previously committed felony." (*Jones, supra,* 25 Cal.4th at pp. 108-109.)

---

[4]Contrarily, immediate flight after commission of a felony, or the so-called escape rule, had been applied to sex crimes for purposes of finding a felony-murder special circumstance. (See *Thompson, supra,* 50 Cal.3d at p. 176.)

The court in *Jones* further stated: "More recently, in *People v. Hernandez* (1988) 47 Cal.3d 315, 348 [253 Cal.Rptr. 199, 763 P.2d 1289], we reiterated that determining whether a killing occurred during the commission of a felony enumerated under . . . section 189 is not ' "a matter of semantics or simple chronology." ' Instead, 'the focus is on the relationship between the underlying felony and the killing.' [Citation.] In *Hernandez*, the defendant raped and sodomized his victims and then killed them when they screamed and struggled to get away; he was convicted, inter alia, of felony murder. We affirmed that the killings, which were 'a direct product of the sexual assaults and to silence the victims,' occurred 'in the commission of' the sex crimes. [Citation] [¶] *People v. Guzman* [(1988)] 45 Cal.3d 915 [248 Cal.Rptr. 467, 755 P.2d 917] [overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]], addressed the similar question whether a killing that took place after a rape occurred 'during the commission of' the offense within the meaning of the felony-murder special circumstance, . . . section 190.2, subdivision (a)(17). We rejected the defendant's argument therein that the special circumstance requires that the murder have occurred at the same time as the rape or ' "*no later than the moment such acts are completed.*" ' (*Guzman, supra*, 45 Cal.3d at p. 950, italics in the original.) Rather, we held that the dispositive question is whether the relationship between the rape and another crime was sufficiently close to justify an enhanced punishment. (*Id.* at p. 951.) We concluded that a jury could reasonably determine that a rape had not terminated 'so long as the victim had not been disposed of or confined.' " (*Jones, supra*, 25 Cal.4th at p. 109.)

Additionally, in *People v. Guzman, supra*, 45 Cal.3d 915 (*Guzman*), the court noted that in an earlier case, *People v. Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], it had determined that a defendant's home was not a place of temporary safety until after the victim had been killed. (*Guzman, supra*, 45 Cal.3d at p. 951.) Although the court in *Guzman* was concerned with the language "while engaged in the commission of" in the felony-murder special circumstance, it determined that such language should carry the same meaning as the broadly interpreted felony-murder "during the commission of" language. (*Guzman, supra*, 45 Cal.3d at pp. 950-951.)

In *People v. Sakarias* (2000) 22 Cal.4th 596 [94 Cal.Rptr.2d 17, 995 P.2d 152], our Supreme Court reiterated its rejection of a " 'strict construction of the temporal relationship' between [a] felony and [the] killing as to both first degree murder and felony-murder special circumstance," to find evidence sufficient to show a single continuous transaction which justifies an instruction on felony murder. (*Id.* at p. 624.)

As one Court of Appeal has expressed, "the [California Supreme Court] has repeatedly rejected interpretations that would place technical limits on the scope of the phrase or require a strict causal relationship between the underlying felony and the homicide. Instead, the court has consistently held that a homicide is committed *in the perpetration of* a felony if the killing and felony are parts of 'one continuous transaction,' and this transaction may include flight after the felony to a place of temporary safety. [Citations.]" (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 188-189 [104 Cal.Rptr.2d 624].) Thus, contrary to Portillo's assertions otherwise, the California courts have discussed the broad construction of the phrase "in the perpetration of" for the scope of the felony-murder rule, have found that such comports with the legislative intent behind such theory and is consistent with the so called "escape rule" found to have been specifically drafted into section 190.2, subdivision (a)(17) "to expand, not to constrict, the scope of the felony-murder-based special circumstances. [Citation.]" (*Guzman, supra,* 45 Cal.3d at pp. 950-951.)

■ Moreover, even if the court's answer to the jury here were arguably an extension beyond the usual felony-murder rule via the so-called escape rule as contended by Portillo, we would find no prejudicial error. Because the evidence fully supported the giving of the felony-murder instructions based upon the underlying crimes of rape and sodomy, the inclusion of language of the escape rule in the court's answer to the jury inquiry clarifying those instructions reasonably defined the outer limits of the "continuous-transaction" theory consistent with the case authority noted above. Thus it did not "erode[] the relation between criminal liability and moral culpability" to apply language of the escape rule here where there was a question whether the killing of the victim was separate from the completion of the sex crimes or was part of the continuous course of conduct that has evolved to apply felony-murder attachment. (See *People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].)

In sum, we conclude the trial court's answer to the jury question on the theory of felony murder based on rape and sodomy was legally proper.

## II, III*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## DISPOSITION

The judgment is affirmed.

Nares, J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 11, 2003. Kennard, J., was of the opinion that the petition should be granted.