[Crim. No. 32873. Second Dist., Div. Four. May 31, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN HERNANDEZ RAMIREZ, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Richard E. Ross, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—In count I of an information, defendant was charged with burglary in violation of Penal Code section 459. The victim was Dorothy S. In addition, it was alleged that the defendant intended to, and did, inflict great bodily injury upon the victim during the commission of the offense within the meaning of Penal Code section 461. It was also alleged that defendant was armed with a deadly weapon, a knife, within the meaning of Penal Code sections 3024, subdivision (a),[1] and 12022 at the time of the commission of the offense.

In count II, defendant was charged with the rape of Dorothy S., in violation of Penal Code section 261, subdivisions 2 and 3. It was additionally alleged that defendant was armed with a deadly weapon, a knife, within the meaning of Penal Code sections 3024, subdivision (a) and 12022, at the time of the commission of the offense.

In count III, defendant was charged with attempted sodomy upon Dorothy S., in violation of Penal Code sections 664 and 286, subdivision (c).

In count IV, defendant was charged with robbery of Dorothy S., in violation of Penal Code section 211. In addition, it was alleged that, at the time of the commission of the offense, defendant was armed with a deadly weapon, a knife, within the meaning of Penal Code sections 3024, subdivision (a), and 12022. It was also alleged that, during the commis-

---

[1]Repealed in 1976, operative July 1, 1977. (Stats. 1976, ch. 1139, § 279, p. 5151.)

sion of the offense, defendant intended to, and did, inflict great bodily injury on the victim.

In count V, defendant was charged with burglary of the home of Ruth R., in violation of Penal Code section 459. In count VI, defendant was charged with burglary of the home of John R., in violation of Penal Code section 459. In count VII, defendant was charged with burglary of the home of Janice F., in violation of Penal Code section 459.

In count VIII, defendant was charged with the burglary of the home of Richard and Ann B., in violation of Penal Code section 459. In addition, it was alleged that, at the time of the commission of the offense, defendant was armed with a deadly weapon, a pistol, within the meaning of Penal Code sections 3024, subdivision (a), and 12022.

In count IX, defendant was charged with the burglary of the home of Marciia M., in violation of Penal Code section 459. In addition, it was alleged that, during the commission of this offense, defendant intended to, and did, inflict great bodily injury upon the victim, within the meaning of Penal Code section 461. It was also alleged that, during the commission of the offense, defendant used a firearm, a pistol, within the meaning of Penal Code section 12022.5. Count IX also contained the allegation that defendant used a firearm, a pistol, during the commission of the offense, said use being within the meaning of Penal Code section 1203.06, subdivision (a)(1).

Defendant was charged in count X with the rape of Marciia M., in violation of Penal Code section 261, subdivision 3. Additionally, it was alleged that, in the commission of the offense, defendant used a firearm, a pistol, within the meaning of Penal Code section 12022.5. A further use allegation was set forth in count X—the use of a firearm, a pistol, within the meaning of Penal Code section 1203.06, subdivision (a)(1).

In count XI, defendant was charged with the robbery of Marciia M., in violation of Penal Code section 211. It was also alleged in count XI that, in the commission of the offense, defendant intended to, and did, inflict great bodily injury on the victim, within the meaning of Penal Code section 213. It was further alleged that, during the commission of the offense, defendant used a firearm, a pistol, within the meaning of Penal Code section 12022.5. An additional allegation in count XI charged that defendant, during the commission of the offense, used a firearm, a pistol, within the meaning of Penal Code section 1203.06, subdivision (a)(1).

Pleas of not guilty were entered as to all counts. Defendant's motion to sever various counts of the information was heard and denied. Trial was by jury.

The jury found defendant guilty as charged on all counts except count III, which was subsequently dismissed. The burglary and robbery of Dorothy S. (counts I and IV) were found to be offenses of the first degree. As to count V, the jury found the burglary to be an offense of the second degree. The remaining burglaries (counts VI through IX) and the robbery (count XI) were found to be first degree felonies. In addition, the jury found true all the firearm use and great bodily injury allegations included in the 10 counts.

Defendant's motion for a new trial was denied. Defendant was denied probation, and sentenced to state prison. The court affirmed the verdicts and findings of the jury with the following exceptions: the court found that Penal Code sections 1203, 3024 and 12022 were applicable to counts I and II, but that Penal Code section 1203 was applicable to counts IV and VIII, and not Penal Code sections 3024 and 12022.

The court ordered that the sentences as to counts I and II were to run concurrently, with the sentence as to count II stayed pending appeal; that the sentences as to counts IX, X and XI were to run concurrently, with the sentences as to counts X and XI stayed pending appeal; and that sentences as to the great bodily injury allegations under counts I and IV were to run concurrently, with the allegation under count IV stayed pending appeal. Sentences as to counts I, IV, V, VI, VII, VIII, and IX were ordered to run consecutively. Defendant's motion in arrest of judgment was denied. He has appealed from the judgment.

No claim is made on this appeal that there was insufficient evidence to support defendant's conviction on the 10 counts. Therefore, our factual summary concerning defendant's one-man crime wave in December 1976, in the Mt. Washington area of Los Angeles, will be presented briefly, and chronologically.

I

*The Factual Summary*

1. *Count V*

Ruth R. left her home on December 10, 1976, and returned two days later, finding two eggs missing from her refrigerator, egg shells and burnt

matches on the floor of the residence and a window screen in the bedroom showing evidence of tampering; she called the police. A photographed palm print on the window ledge was, according to expert testimony at trial, that of the defendant.

### 2. *Count VI*

The R. family awoke on December 13, 1976, and found they had had a visitor during the night, who apparently had entered the house through a sliding glass door which was off its track when discovered. There was evidence that an avocado had been eaten and a beer can was found on the living room floor. Money had been taken from Mrs. R.'s purse, and also some $50 or $60 taken from her stepdaughter's purse. Outside the house, the stepdaughter's purse was found, cut in half and the contents strewn in the driveway. Her keys had been broken, apparently during an attempt to use them to open Mr. R.'s car. An artbook was found on top of a neighbor's car; it had been in the R. living room. The police investigated and lifted prints off the beer can and the art book; these prints were later matched with defendant's prints. Mrs. R.'s probation officer badge was missing.

### 3. *Counts I through IV*

Dorothy S., a 68-year-old widow, was asleep in her Mt. Washington residence at approximately 4:30 a.m. on December 14, 1976, when she was awakened by her barking dog. She arose to investigate, and was grabbed by defendant, standing at the foot of her bed. Defendant had a knife which he held to her throat; he had a bandanna covering his face. The victim asked defendant if he wanted money; he said he did, and Mrs. S. got her purse and gave him the $6 therein; defendant was angry there was so little, and threw the money on a desk.

Defendant then announced to Mrs. S. that he was going to have sexual intercourse with her. She remonstrated that he should find someone younger; but he pushed her to the floor of the dining room and raped her from the front and the rear. He then attempted to sodomize her. During these events, defendant struck Mrs. S., pulled her hair, and banged her head on the floor several times.

Defendant moved the victim to the bedroom and penetrated her again several times; he pinched her breasts and put his fingers over her face and mouth. Mrs. S. went to the bathroom and vomited.

Defendant then ransacked the bedroom, taking some pieces of jewelry; he took the money and a radio from the dining room. While defendant was still in the dining room, walking toward a cabinet he had not searched before, the victim managed to leave the house and run to her sister's residence next door to call the police. Mrs. S. was very upset; a subsequent physical examination showed that her vagina contained sperm. Mrs. S. was bruised, had a sore rib, and neckaches and backaches for a long time after these events took place. It was discovered that the dog door in the back door of the S. residence had been utilized to reach in and unlock the back door. Mrs. S. identified the defendant as her assailant at a lineup held on December 20, 1976, and at the preliminary hearing and at trial.

### 4. *Count VII*

On December 14, 1976, at about 10:45 a.m., Janice F. encountered defendant in the downstairs hallway of her residence. She recognized defendant as the person she had seen earlier, a few days before, standing on an upstairs porch. Defendant started moving toward Janice and attempted to engage her in conversation about who was present in the house. Janice's sister started down the stairs toward them and Janice yelled to her to run to a friend's house and call the police. Defendant left quickly. Prints were found by the police on a laundry room window sill; one was determined to be defendant's print. Janice identified defendant at the lineup on December 20, 1976, and again at the preliminary hearing and at trial.

### 5. *Count VIII*

On December 17, 1976, Mr. and Mrs. B. left their residence about 5 p.m. and returned at 7 p.m. They found that the back door of their house had been ripped out of the frame. Inside, garbage had been strewn on the kitchen floor. The house had been ransacked and was in general disarray. A search revealed that a camera was missing, as well as a ring and a distinctive T-shirt owned by Mr. B. It was also discovered that a Beretta .22 caliber pistol had been taken, which contained a loaded ammunition clip.

### 6. *Counts IX through XI*

On December 17, 1976, Marciia M. was alone in her residence at about 6:30 p.m. when she heard a noise at the rear of her house. When she

investigated, she saw a head move away from her bathroom window. She went into the living room and picked up the phone to call the police, but upon hearing a noise in the bathroom, ran out the back door before she could complete the call. Marciia was tackled by defendant on the back steps. He placed a gun at her temple, and a sharp object against her ribs; he forced her to return to the bedroom of her home. There he demanded money. Marciia gave him $200 in an envelope. Defendant then picked up Marciia's bedding, and forced her to accompany him outside, over a fence and into a neighbor's yard. Marciia struggled with defendant, who choked her, pulled her hair and hit her on the head with the butt of the gun.

Defendant then raped Marciia, penetrating her both front and rear. The victim attempted to seize the gun, and succeeded in removing the ammunition clip, but defendant regained possession of the weapon. Defendant asked the victim many questions about herself. Defendant then took Marciia back to her house, and she managed to escape to a neighbor's house. The police arrived and recovered the envelope in which Marciia had placed her money, as well as a knife and the loaded ammunition clip in the area where the rapes had taken place. Marciia was transported to a hospital; she was very upset, and had scrapes on her legs, including one long one extending from the knee to the ankle. Marciia testified that she had sustained injuries to her neck, throat, legs, feet and hands, and that she still had scars on her left leg at time of trial. Marciia had given the police a detailed description of defendant. A subsequent physical examination of Marciia revealed that sperm was present in her vagina.

Neighbors of Marciia saw defendant the next day, December 18, 1976, headed in the direction of Marciia's residence, and alerted the police. He was arrested in the general vicinity, carrying a brown paper bag which contained the .22 Beretta, ammunition, and a can of beer. He was wearing the distinctive T-shirt stolen from Mr. B; his levis contained a Smith and Wesson .38 revolver, and a bandanna; Mr. B.'s class ring was found in his pants, as was the probation officer badge belonging to Mrs. R.

Evidence at trial established that all of the crimes occurred within a relatively small geographical area of the City of Los Angeles. There was general agreement among the witnesses who had had personal contact with the defendant with respect to his physical description, type of clothing, speech, demeanor and modus operandi.

Defendant testified at trial (despite the advice of his counsel) and offered no clearcut defense. There emerged, however, a story that defendant had apparently been drinking heavily the week before his arrest. It is significant that defendant did not categorically deny his involvement in the rampant criminal activities. Many of his statements on the witness stand were either nonresponsive, incoherent, or bizarre.[2]

## II

### *The Great Bodily Injury Enhancements*

██ At the time this information was filed, Penal Code sections 461, 213, and 264 provided for a substantial enhancement of sentence for the perpetrators of burglary, robbery or rape when, during the commission of these crimes, the perpetrators caused the infliction of great bodily injury on the victims of these crimes. In enacting these enhancement provisions, one intent of the Legislature was undoubtedly to provide protection for prospective victims of such crimes by creating what was expected to be a deterrent to the use of unnecessary force and violence as well as adequate punishment for the perpetrators.

In the case at bench, great bodily injury enhancement was sought by the prosecution in counts I (burglary) and IV (robbery), as to Dorothy S., and in counts IX (burglary) and XI (robbery), as to Marciia M. In instructing the jury on the meaning of "great bodily injury" the trial court stated that it referred to "significant or substantial bodily injury" rather than "trivial or insignificant injury or moderate harm"; the trial court also instructed the jury that "[f]orcible rape of a victim of a robbery or of a burglary, *alone, without any showing of additional injury,* may be sufficient to constitute Great Bodily Injury." (Italics added.)

As indicated, the jury found the allegations to be true, and the trial judge affirmed the findings.

██ ██ On this appeal, defendant seeks to have stricken the resultant enhancements of sentence, contending that (1) there was insufficient evidence to support the finding that "great bodily injury" had been inflicted on Dorothy S. and Marciia M. "in the course of

---

[2]Prior to trial, two psychiatrists were appointed by the court to assist defense counsel in assessing defendant's mental condition. The record indicates that defendant refused to plead not guilty by reason of insanity. The trial judge expressed the view on a number of occasions that defendant was feigning symptoms of mental instability to impress the jury.

commission of the [underlying] offenses"; (2) there was insufficient evidence to support the findings that the injuries sustained by these victims constituted the significant and substantial injuries the enhancement provisions were designed to prevent; and (3) the jury was erroneously instructed that forcible rape, in and of itself, could be found to be "great bodily injury."

■ Defendant makes the argument that his responsibility for infliction of great bodily injury must be determined by the application of a time frame, an application limiting jury consideration to only those acts of alleged great bodily injury committed before it may be said that the underlying crime had been "completed." This argument is lacking in merit. Adoption of this approach would, of necessity, introduce an artificial analysis as to when the underlying robbery, burglary or rape had been "completed" and, in our view, would subvert the legislative intent in enacting the enhancement provisions. ■ In *People* v. *Walls* (1978) 85 Cal.App.3d 447, 453 [149 Cal.Rptr. 460], the court observed that, "[t]o establish commission of a burglary the prosecution need only prove that one entered the premises with the intent to commit . . . a felony, and the crime is complete for that purpose, but this does not dictate the conclusion that the crime is complete for *all* purposes . . . ." (Italics added.) ■ We note, too, that the prevailing rule in felony-murder cases is that the underlying crime is not complete until a defendant has reached a "place of temporary safety." (*People* v. *Salas* (1972) 7 Cal.3d 812, 820-824 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].)

■ Here defendant entered the home of the victims with two purposes in mind: robbery and rape. He stayed on the premises long enough to accomplish both purposes, prior to retreating elsewhere. Defendant's activities on the premises of the victims constituted a continuous course of criminal conduct under the circumstances presented here, and we conclude that the great bodily injury enhancement provisions became applicable throughout his stay. Defendant's suggested interpretation of the great-bodily-injury enhancement provisions would preclude any additional punishment for acts which might, in one sense, occur *"after"* the elements of the underlying crime had been established, but which in light of the legislative purposes, occur *"during"* a defendant's course of conduct culminating in the commission of the underlying offense and escape from detection and apprehension.

Defendant's second contention must be considered in light of *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274]. The *Caudillo* court held that the great bodily injury, designed by the Legislature to trigger enhanced sentences, must be significant, substantial injury, as contrasted with injuries "that can logically only be described as constituting transitory and short-lived bodily distress . . . [that] do not fall within the contours of injuries that are severe or protracted . . . ." (*Id.*, at p. 588.) *Caudillo* concluded that not only must injuries be severe, they must be physical, rather than psychological, and that, within these guidelines, the severity of the injury sustained is normally a question of fact for jury determination. The *Caudillo* court emphasized, however, that the injury must rise to a certain level of severity and permanence before it may be the basis for an extended prison term. ▮ In the case at bench, however, we need not assess the sufficiency of this evidence, particularly with respect to the nature of the distress inflicted upon the elderly Dorothy S., because, as will be seen, as defendant contends, the instruction on great bodily injury given by the trial court was an erroneous instruction.

The trial court informed the jury that "forcible rape," *in and of itself,* could constitute great bodily injury. That was not an accurate statement of the law. In *People* v. *Caudillo, supra,* after an exhaustive review of the legislative history and purpose underlying the enactment of Penal Code sections 461, 213, and 264, the California Supreme Court concluded that "forcible rape cannot, in and of itself, constitute great bodily injury for the enhancement-of-punishment provision of burglary (Pen. Code, § 461), . . ." (*Caudillo, supra,* 21 Cal.3d 562, 587.) The decision is equally applicable to the underlying crime of robbery.

Thus, the jury in the case before us, was improperly instructed. We would deem it an exercise in futility if we were to speculate with respect to the basis for the jury's finding that great bodily injury had been inflicted on Dorothy S. and Marciia M. We have no way of knowing whether the jury was influenced by evidence that established the commission of the rapes, without more, the accompanying harm caused by the force used, or a combination of both elements. The instructional error, therefore, must be regarded as prejudicial to defendant. Consequently, pursuant to the rule of law enunciated by *Caudillo,* we strike the "great bodily injury" enhancements of sentence imposed in counts I, IV, IX, and XI.

## III

### The Sentencing on the Dorothy S. Counts

Defendant advances the contention that the judgment of the trial court specifying that the sentence imposed under count IV be served consecutively with that imposed under count I constituted multiple punishment in violation of Penal Code section 654. That section provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punishable under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

Section 654 was explained in *People* v. *Beamon* (1973) 8 Cal.3d 625, 637 [105 Cal.Rptr. 681, 504 P.2d 905], in the following language: " ' "Section 654 has been applied not only where there was but one 'act' in the ordinary sense . . . but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654." [Citation.] [¶] Whether a *course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective of the actor*. If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.] . . ." (Italics in original.) The *Beamon* court proceeded to say that "[i]f [defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (8 Cal.3d 625, 639.)

In the case at bench, the trial court was considering the three counts upon which the jury had convicted defendant with respect to Dorothy S.: Count I (burglary), count II (rape) and count IV (robbery). The trial court determined that defendant's intent upon entry into the house was to commit rape; reference was made to the evidence which showed that defendant had rejected the victim's offer of $6 and had turned to rape of the victim instead. The trial court reasoned that the burglary and the rape were indivisible acts, and thus, as a part of the judgment, stayed the rape count pending completion of the sentence on

the burglary count. However, the trial court determined that the intent to rob Dorothy was formed by defendant after he had raped her. Hence, this constituted a separate intent with the resultant *separate* offense of robbery for which an additional consecutive sentence could be imposed.

Our review, of course, is limited to a determination of whether there was sufficient evidence to support the trial court's findings. We think it clear from the evidence that defendant had dual objectives while he was in the Dorothy S. premises, and that, as a consequence, he may be punished for both completed objectives, rather than singly punished for an indivisible course of conduct. Consequently, we hold, as lacking in substance, defendant's contention that the two lesser counts of the three should be stayed pending service of sentence on the most serious count. The evidence adequately supports the determination of the trial court.

## IV

### *The Sentencing on the Marciia M. Counts*

■ Defendant next contends that, because the trial court found that the offenses charged in counts IX, X and XI (the Marciia M. counts) constituted one indivisible course of conduct, there may only be one firearm-use finding (Pen. Code, § 12022.5) under those counts. We agree. It was explained in *In re Culbreth* (1976) 17 Cal.3d 330, 334 [130 Cal.Rptr. 719, 551 P.2d 23], that " 'the statute [Pen. Code, § 12022.5] envisions a single application of deterrent force for each occasion, hopefully to deter gun use on a future occasion. Where, as here, a single judgment imposes sentences for several crimes committed upon a single occasion, only one finding under section 12022.5 is permissible.' " In *Culbreth,* the defendant had shot and killed at the same location his common law wife, his mother-in-law, and his brother-in-law. Defendant was convicted of two counts of second degree murder and one of voluntary manslaughter, with a jury finding that a firearm—a rifle—had been used in the commission of each offense. (Pen. Code, § 12022.5.) The *Culbreth* court concluded that "the homicides—the two second degree murders and the manslaughter —occurred in a matter of seconds, all part of a single melee. There was but one occasion, one intent, one objective, one indivisible transaction. Therefore section 12022.5 may be applied *only once.*" (*Id.,* at p. 335.) (Italics added.)

The analysis of *Culbreth* is dispositive with respect to the situation presented in the case at bench. The evidence supports the trial court's

finding that the crimes committed by defendant which involved the victim, Marciia M.—the three offenses of burglary, robbery and rape—were parts of an indivisible transaction. Hence, it was error for the firearm-use enhancement provision to be made applicable to each offense involved in counts IX, X and XI.

V

*The Armed Allegations of Counts I and II*

 Defendant argues that the armed-with-a-deadly-weapon allegations contained in counts I and II (the burglary and rape of Dorothy S.), found true by the jury and affirmed by the trial court, must be stricken because there was insufficient evidence to support such findings, and, further, because the jury was not adequately instructed concerning the meaning of a "deadly weapon."

The record reveals that Dorothy, the victim, testified that, at the time he initially assaulted her, defendant held to her throat a knife which was taken from her kitchen, and that she kicked this knife under her bed while defendant was ransacking the bedroom. Although the police examined this knife during their criminal investigation, it was neither described in testimony at trial nor was it introduced into evidence as an exhibit. A knife was introduced into evidence as People's exhibit 17, identified as the weapon recovered by police officers from the area of the Marciia rape some time after the Dorothy rape. Marciia could not identify exhibit 17 as a knife from her kitchen, although she stated it was similar to the knives situated there.

On the dates these offenses were committed, the sentence-enhancement provisions of Penal Code section 12022 were applicable when a defendant committed a felony (or attempted to) while armed with any of the deadly weapons, as defined by subdivision (f) of Penal Code section 3024. That section enumerated as "deadly weapons" various weapons, including "any knife having a blade longer than five inches." The decisional law interpretations of this section have limited it to the enumerated descriptions of "deadly weapons," but for the purpose of *enhancement* of sentence only, which is the subject matter of the section.

Thus, in *People* v. *Caberera* (1930) 104 Cal.App. 414 [286 P. 176], the predecessor to Penal Code section 3024, subdivision (f) (Pen. Code, § 1168) was found inapplicable in determining the meaning of a "deadly weapon" as used in Penal Code section 245 (assault with deadly weapon); and in *People* v. *Raner* (1948) 86 Cal.App.2d 107 [194 P.2d 37], section 3024, subdivision (f), was found inapplicable in determining the meaning of "deadly weapon" as used in Penal Code section 211a (first degree robbery). It was stated in *People* v. *Henderson* (1957) 151 Cal.App.2d 407 [311 P.2d 594] that the enhancement-of-sentence-definition of a deadly weapon, contained in Penal Code section 3024, has no bearing on other provisions of the Penal Code which use the term, "deadly weapon." And finally, in *People* v. *Aranda* (1965) 63 Cal.2d 518, 533 [47 Cal.Rptr. 353, 407 P.2d 265], the California Supreme Court implicitly recognized the limited applicability of Penal Code section 3024, subdivision (f), in distinguishing a toy pistol from a "pistol, revolver, or any other firearm," as used in section 3024.

 From these authorities, we conclude that, for sentence-*enhancement* purposes, as distinguished from the purpose of proving the elements of such a crime as an assault with a deadly weapon (Pen. Code, § 245, subds. (a) or (b)), the prosecution must prove that, to constitute a "deadly weapon," a knife used in the commission or attempted commission of a felony comes within the statutory definition of a knife as a deadly weapon as set forth in Penal Code section 3024, subdivision (f), i.e., had a blade longer than five inches. One method of providing such proof, of course, is to introduce the knife as an exhibit, so that it may be examined by the properly instructed jury or the reviewing court. (See, e.g., *People* v. *Iverson* (1972) 26 Cal.App.3d 598, 603 [102 Cal.Rptr. 913], disapproved on other grounds in *In re Earley* (1975) 14 Cal.3d 122, 130, fn. 11 [120 Cal.Rptr. 881, 534 P.2d 721].) Another method of proof would involve description of the knife in issue by a witness who saw the knife. No such proof was introduced in the case before us.

The People argue that the jury could reasonably have inferred from the evidence that the knife used in connection with the Dorothy S. offense was a kitchen knife exceeding five inches in length. But in the absence of evidence, there is no basis for an assumption that all kitchen knives have blades that exceed five inches in length. For such an assumption to be operative, we would need the application of the doctrine of judicial notice. Although, under Evidence Code section 451, subdivision (f), judicial notice is required to be taken of "[f]acts and propositions of generalized knowledge that are so universally known that they cannot

reasonably be the subject of dispute," there is nothing in the record here to mandate the application of Evidence Code section 451, subdivision (f).

The People also refer us to *People* v. *Cabral* (1975) 51 Cal.App.3d 707 [124 Cal.Rptr. 418], which dealt with Penal Code section 245, subdivision (a), which defines the felony offense of committing an assault with "a deadly weapon or instrument or by any means of force likely to produce great bodily injury." The *Cabral* court determined, as a matter of law, that a jail-made weapon, used to stab an inmate, was a "deadly weapon" within the meaning of section 245, subdivision (a). But as we have explained, the enhancement-of-punishment section of the Penal Code with respect to deadly weapons (Pen. Code, § 3024, subd. (f)), involved here, has its own specific definition of such a term. Under such circumstances, the decisional law interpretation of Penal Code section 245, subdivision (a), which does not contain a specific definition of "deadly weapon," lacks any persuasive value with respect to Penal Code section 3024, subdivision (f).

In the case at bench, the problem was compounded by the instruction to the jury concerning what constitutes a "deadly weapon." The jury was first told that in counts I, II and IV, it was charged that defendant was armed with a deadly weapon, namely, "a knife" while in count VIII, the deadly weapon charge consisted of "a gun." The jury was then instructed that the term "deadly weapon," as used in the previous instruction "includes pistol, revolver, or any other firearm or any razor with an unguarded blade." These two instructions were erroneous as they authorized the jury to find that defendant's being armed with a "knife" of any kind constituted being armed with a "deadly weapon" insofar as counts I and IV were concerned.[3]

As explained by the *Cabral* court, "the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so, and . . . those general principles are the ones commonly or closely and openly connected with the facts of the case . . . ." (*Cabral, supra,* 51 Cal.App.3d 707, 711.)

---

[3]CALJIC No. 17.17 provides that "[t]he term 'deadly weapon' . . . includes any instrument or weapon of the kind commonly known as a blackjack, slung shot, billy, sandclub, sandbag, metal knuckles, any dirk, dagger, pistol, revolver, or any other firearm, *any knife having a blade longer than five inches,* any razor with an unguarded blade and any metal pipe or bar used or intended to be used as a club. . . ." (3d ed., p. 557.) The instruction given to the jury was a modification of CALJIC No. 17.17 which ommitted the definition of a "knife" as a deadly weapon.

■ Thus, the record before us reflects not only a prosecutorial lapse as to proof, but an inadequate definition of the term "deadly weapon" contained in the instructions to the jury as it applied to the armed allegations of counts I and II. We are compelled, therefore, to strike the findings of armed-with-a-deadly-weapon from counts I and II as unsupported by the evidence.

We cannot speculate as to what sentences in terms of concurrent or consecutive counts the trial judge would have imposed in the absence of the various enhancements which we find necessary to strike from the judgment. Consequently, we must return the case to the trial court for resentencing only.

The judgment is reversed for resentencing purposes only, with directions to the trial court to resentence defendant with the "great bodily injury enhancements" stricken from counts I, IV, IX and XI, the "armed-with-a-deadly weapon enhancements" stricken from counts I and II, and the "firearm-use enhancements" to be made applicable only once with respect to counts IX, X and XI.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied June 21, 1979, and the opinion and judgment were modified to read as printed above.