[Civ. No. 52059. First Dist., Div. Three. Aug. 28, 1981.]

NEIL ROBERT JONES, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[Civ. No. 52095. First Dist., Div. Three. Aug. 28, 1981.]

STERLING BRUCE JONES, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

James R. Jenner, Public Defender, and Albert J. Wax, Assistant Public Defender, and Michael C. Ciraolo for Petitioners.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and John B. Moy, Deputy Attorneys General, for Real Party in Interest.

OPINION

WHITE, P. J.—Petitioners Sterling and Neil Jones are presently charged by information with first degree murder of Charlotte Andrea Turner (§ 187).[1] Indisputably the evidence adduced at the preliminary hearing demonstrates that Turner met her death execution-style. As just punishment, the People seek imposition of the death penalty. The information alleges four special circumstances: (1) that the murder of Charlotte Turner was committed while defendant Neil Jones was engaged in and was an accomplice in the commission, the attempted commission, and the flight thereafter of the felony rape (§ 190.2, subd. (a)(17)(iii)); (2) the same allegations as to defendant Sterling Jones; (3) that the murder of Charlotte Turner was committed while the defendant Neil Jones was engaged in and was an accomplice in the commission, the attempted commission, and the flight thereafter of the felony of oral copulation (§ 190.2, subd. (a)(17)(vi)); (4) the same allegations as to defendant Sterling Jones.

The Superior Court of Alameda County (Honorable Martin Pulich) denied petitioners' section 995 motions to dismiss the special circumstances allegations against them. These petitions for writs of mandamus and/or prohibition in compliance with section 999a followed. In each action we ordered that the alternative writ of prohibition issue and therewith stayed further proceedings on the special circumstances allegation alleged in the information. Initially, the answers to the questions

---

[1] All statutory references are to the Penal Code.

posed by the record presented proved to be somewhat elusive. Before oral argument we requested the parties to submit further briefing addressing issues not initially covered by the petitions and the preliminary opposition.

For purposes of this opinion, a lengthy summary of the preliminary examination testimony is not required. It is sufficient to state that the evidence of record is that on Sunday morning, July 20, 1980, shortly after 1 a.m., petitioners each raped Ms. Turner and forced her to orally copulate them. These felonious sexual assaults were perpetrated within the confines of Turner and Vernon Greer's home at gunpoint (Greer held at bay). Their sexual crimes physically completed, petitioners conferred.

Greer overheard petitioners' discussion proposing the alternatives of killing on site or taking the couple to the Alameda. They decided to take them to the Alameda, and Neil Jones told them they would not be killed but would be taken to "the man" to determine if Greer was a dope dealer. Ms. Turner was ordered out of the house first and threatened violence if she ran.

Petitioners' station wagon was used (Sterling driving) to transport their hapless victims to a roadside location some two miles distant. The kidnaping culminated with petitioner Neil Jones first shooting and killing execution-style Ms. Turner and then shooting and felling Greer who fled when the gun held at his head jammed.[2]

The parties agree that the preliminary record reveals that Ms. Turner was raped and forced to orally copulate at a different location and time from where and when she was subsequently killed. Consequently, petitioners' challenge to the trial court's order requires that this court determine whether the killing of Ms. Turner can be found to have occur-

---

[2]By information No. 71354 filed in Alameda County Superior Court on December 15, 1980, Sterling and Neil Jones were charged: Count one, first degree murder of Charlotte Andrea Turner (§ 187); special circumstances set forth in section 190.2, subdivision (a)(17)(iii) and (vi) were alleged; count two, attempted murder of Vernon Greer; count three, forcible rape of Charlotte Andrea Turner (§ 261), acting in concert to commit the offenses; counts four and five, forcing Charlotte Andrea Turner to orally copulate them (§ 288a), acting in concert to commit the offenses; counts six and seven, kidnaping Charlotte Andrea Turner and Vernon Greer (§ 207). The information included allegations defendants were armed with a firearm (§ 12022, subd. (a)), used a firearm (§ 12022.5) and personally inflicted great bodily injury (§§ 1203.075, 12022.7).

red while petitioners were "engaged in" or were in "the immediate flight after committing" the crimes of rape and oral copulation within the meaning of section 190.2, subdivision (a)(17)(iii) and/or (vi).

Section 190.2, subdivision (a) provides for the alternative punishments of death or confinement for life without possibility of parole in any case of first degree murder in which one or more of a long list of special circumstances "has been charged and specially found . . . to be true." The particular special circumstances charged here are contained in subparagraph (17): "The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies:

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(iii) Rape in violation of Section 261.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(vi) Oral copulation in violation of Section 288a."[3]

Thus, the question presented in these petitions naturally divides into two parts. Determining the answer in both parts depends more upon the

[3]Not charged, but potentially applicable here are section 190.2, subdivision (a)(10): "The victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission, or attempted commission or [sic] the crime to which he was a witness; . . ." and section 190.2, subdivision (a)(17)(ii): "The murder was committed while the defendant was engaged in . . .: [¶] (ii) Kidnapping in violation of Sections 207 and 209."

We can only speculate that the kidnaping special circumstance was not alleged because of the decision in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]. Among the *Green* court's rulings was a ruling that the robbery special circumstance which read "during the commission of a robbery" did not apply where the robbery was incidental to the murder (for purposes of concealing the identity of the corpse in that case). The argument could be made that if the kidnaping here was for purposes of murder, the murder was not "during the commission of" or even "while engaged in" kidnaping. It is possible the prosecution sought to avoid such an argument by not charging the kidnaping special circumstance. (See also *People* v. *Thompson* (1980) 27 Cal.3d 303, 321-325 [165 Cal.Rptr. 289, 611 P.2d 883].)

legal boundaries of the quoted terms of the statute than upon the inferences to be drawn from the evidence.

## Part I

*Was there sufficient evidence to sustain a finding that the murder was committed while the defendants were "engaged in" the commission of rape and/or oral copulation?*

We think a lay person's answer to this question would be obvious: · The sex crimes were completed some time before the killing took place. Petitioners both argue for this conclusion, stressing that the killing took place in a different location and at a different time from the alleged rape and oral copulation. The Attorney General argues, however, that the sex crimes were not completed for purposes of the statute until petitioners had reached a place of temporary safety.

The Attorney General's argument begins by noting dicta in the decision in *People* v. *Green, supra,* 27 Cal.3d 1, 61, where the Supreme Court explained that the purpose of special circumstances is to provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not. "The Legislature declared that such a distinction could be drawn, inter alia, when the defendant committed a 'willful, deliberate and premeditated' murder 'during the commission' of a robbery or other listed felony. [Citation.] The provision thus expressed a legislative belief that it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood in order to advance an independent felonious purpose, e.g., *who carried out an execution-style slaying of the victim of or witness to a holdup, a kidnaping, or a rape.*" (Italics added.) The Attorney General then argues that the murder here was committed to conceal the identity of the criminals who raped and orally copulated Ms. Turner. This argument fails to note that section 190.2, subdivision (a)(10) is a more specific provision which might be applicable to such a killing. (See fn. 3, *ante.*)

Next, the Attorney General argues that it would be irrational to subject to the death penalty one who killed the victim at the time and place of the crime, but not one who transported the victim to a secluded spot and killed her. He asserts that the latter person is more culpable because he has kidnaped her in the process. The argument fails to note the possibility that such a killing would arguably be covered by the kid-

naping special circumstance enumerated in section 190.2, subdivision (a)(17)(ii). (See fn. 3, *ante.*)

The Attorney General's proposal for a more rational reading of the special circumstance statute is bottomed upon a line of cases which has developed in the felony-murder context and which finds that the underlying felony has not been completed until the defendant has reached a place of temporary safety. (See *People* v. *Ramirez* (1979) 93 Cal.App. 3d 714 [156 Cal.Rptr. 94]; *People* v. *Fuller* (1978) 86 Cal.App.3d 618, 623 [150 Cal.Rptr. 515].)

In an early statement of felony-murder law, the Supreme Court in *People* v. *Boss* (1930) 210 Cal. 245, 250-251 [290 P. 881], rejected a contention that a killing during immediate flight with robbery loot was not in the "perpetration" of the robbery, stating inter alia: "It is a sound principle of law which inheres in common reason that where two or more persons engage in a conspiracy to commit robbery and an officer or citizen is murdered while in immediate pursuit of one of their number who is fleeing from the scene of the crime with the fruits thereof in his possession, or in the possession of a co-conspirator, *the crime is not complete in the purview of the law, inasmuch as said conspirators have not won their way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession.* In such a case the continuation of the use of arms which was necessary to aid the felon in reducing the property to possession is necessary to protect him in its possession and in making good his escape. Robbery, unlike burglary, is not confined to a fixed *locus*, but is frequently spread over considerable distance and varying periods of time. The escape of the robbers with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property. Without revolvers to terrify, or, if occasion requires, to kill any person who attempts to apprehend them at the time of or immediately upon gaining possession of said property, their plan would be childlike. The defense of felonious possession which is challenged immediately upon the forcible taking is a part of the plan of robbery, or as the books express it, it is *res gestae* of the crime." (Italics added.)

The *Boss* doctrine has been repeatedly applied in subsequent robbery cases. (See, e.g., *People* v. *Salas* (1972) 7 Cal.3d 812 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]; *People* v. *Ketchel* (1963) 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Kendrick* (1961) 56 Cal.2d 71 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Rye* (1949) 33

Cal.2d 688 [203 P.2d 748].) In *People* v. *Fuller, supra*, 86 Cal.App.3d 618, the doctrine was applied to felony-murder where the underlying felony was burglary. The *Fuller* court observed that the *Boss* dictum about the distinction between burglary and robbery did not withstand analysis and concluded that felony-murder could be found when a killing took place during flight after burglary. "A burglary predicated on theft can be committed with equal or greater violence than a robbery, and leaving the scene with the stolen property is equally important." (86 Cal.App.3d 618, 623; see also *People* v. *Mason* (1960) 54 Cal.2d 164 [4 Cal.Rptr. 841, 351 P.2d 1025].)

With little analysis or discussion, the *Boss* doctrine, as interpreted by later cases, has been applied in felony-murder cases where the underlying felony was rape. In *People* v. *Chavez* (1951) 37 Cal.2d 656 [234 P.2d 632], the defendant had proposed instructions requiring the jury to find the murder to have been a part of the rape "'in an actual and material sense, and have resulted as a natural and probable consequence thereof.'" (At p. 669.) Citing *Boss, supra*, and *Rye, supra*, the *Chavez* court concluded that it was necessary only that the felony and the killing be part of one continuous transaction. (Accord, *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Welch* (1972) 8 Cal.3d 106, 118-119 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *Medina* (1974) 41 Cal.App.3d 438, 451-452 [116 Cal. Rptr. 133].)

The rationale for applying the "place of temporary safety" or "scrambling possession" theories in a rape case is questionable, since the doctrine depends upon the asportation element of robbery. However, more important in analyzing this case is the distinction in language between the felony-murder statute and the special circumstance allegations of section 190.2, subdivision (a)(17). Under felony murder, all that is required is that the killing be "in perpetration of" the felony, whereas the requirement in this case is that the killing be while the petitioners were "engaged in" rape and/or oral copulation.

In *People* v. *Chavez, supra*, 37 Cal.2d 656, 669, the court observed that the defendant erroneously assumed that "to bring a homicide within the terms of section 189 of the Penal Code, the killing must have occurred 'while committing,' 'while engaged in,' or 'in pursuance' of the named felonies, and that the killing must have been 'a part of' the felony or attempted felony." The court then articulated the established felony-murder doctrine discussed above and concluded that "[t]here be-

ing no requirement that the homicide occur 'while committing' or 'while engaged in' the felony, or that the killing be 'a part of' the felony, other than that the two acts be part of one continuous transaction, the trial court did not err in refusing the requested instructions. (37 Cal.2d, at p. 670.)

The *Chavez* court's distinction between "in perpetration of" and "while engaged in" draws into serious question the Attorney General's proposal herein that felony-murder case law be imported into the interpretation of the special circumstance statute. By having chosen the more narrowly characterized term "while engaged in," the drafters of the death penalty initiative may have signalled an intent that the "scrambling possession" and "place of temporary safety" doctrines not apply to special circumstance law.

Our request for additional briefing was designed to shed some light on the possible implications of the *Chavez* decision. The Attorney General's response is that the *Chavez* decision should not be read as giving some distinctive meaning to the words "while engaged in," particularly where, as in section 190.2, subdivision (a)(17), the complete phrase is "while ... engaged in ... commission of" the underlying crime. He notes a dictionary definition of "perpetrate" which equates it with "commit" and contends that the terminology "while in the perpetration of" is synonymous with the phrase "while engaged in the commission of." Furthermore, he observes that in *Chavez*, the proposed instructions were more specific than "while engaged in" and would have required a finding that the killing would have been a part of and natural consequence of the felony. The implication of this observation is that the *Chavez* court's discussion of "engaged in" was dicta because the more restrictive portions of the proposed instructions would have invalidated them even without the "while engaged in" language.

The Attorney General's suggestion that not too much be read from the *Chavez* dicta is sound advice, in part because there is not complete identity between the proposed instruction in *Chavez* and the language of the special circumstance provision in issue in the case at bench. However, in our view, the existence of the *Chavez* discussion does point out the need to be precise in the language of penal statutes. If the initiative drafters had used the language "in perpetration of," a body of case law giving form to the phrase would have been imported into the special circumstance legislation.

The Attorney General proposes, in effect, that the "in perpetration of" body of case law should be found applicable to different words, i.e., "engaged in" and supports his proposal by policy arguments and by urging that the electorate certainly would have wanted broad application of the special circumstance provisions: "It cannot reasonably be inferred that the drafters of the 1978 Initiative Measure and the electorate who overwhelmingly voted for it intended criminals who execute their victims to escape the death penalty. Executioners were subject to the death penalty under the 1977 law and are also under the new law. If rape and forced oral copulation and the execution slaying are part of one continuous transaction, the special circumstances of section 190.2(a)(17) (iii) & (vi) are applicable.

". . . . . . . . . . . . . . . .

". . . To hold that the rape and oral copulation offenses ended at the precise moment the physical indignities ended, or the moment when defendants left the victims' house with the victims at gunpoint would greatly undermine a law intended to apply capital punishment to one of the most reprehensible of murderers, the execution slayer. Should this Court limit application of section 190.2(a)(17) to murders which occur while the defendant is *engaged in* the physical act of rape or oral copulation the message to potential rapist-murderers would be clear. To avoid the death penalty simply kill your victim away from the scene of the underlying felony. This must not be the rule." (Italics added.)

If the "while engaged in" portion of section 190.2, subdivision (a)(17) were the only special circumstance provision, this argument would have compelling emotional appeal (if not legal substance). However, the Attorney General seems to suffer from tunnel vision. If the killing herein was not while "engaged in" oral copulation and/or rape, it may well come within the provisions of subparagraph (10) involving the killing of a witness for purposes of preventing testimony where the killing is not "during the commission" of the witnessed crime. Or it may be while engaged in kidnaping (§ 190.2, subd. (a)(17)(ii)). Or, as will be discussed below, it may be while "engaged in . . . the immediate flight after" rape and/or oral copulation. If this court were to rule that "engaged in" does not have the broad meaning given by the courts to "in perpetration of," the probable result would be prosecution under a different subparagraph, not complete avoidance of the death threat.

The 1977 death penalty legislation, which was superseded by the 1978 initiative measure presently in force, provided a potential penalty of death for one who committed murder for hire, murder by explosives, murder of a peace officer, murder of a witness to prevent testimony, murder by torture, multiple murders, or murder "during the commission or attempted commission of" robbery, kidnaping, rape, lewd act upon a child, or burglary of an inhabited dwelling (Stats. 1977, ch. 316, § 9). The legislative analyst's analysis of the 1978 initiative measure, printed in the election brochure, explained that it would "expand and modify the list of special circumstance" and that the new list would include "murder committed during or while fleeing from the commission or attempted commission of robbery, kidnapping, specified sex crimes . . . burglary, arson and trainwrecking." The ballot argument in favor of the initiative stated that it was needed "[b]ecause the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would . . . . And, it would apply to all situations which are covered by our current death penalty law."

Clearly, the death penalty initiative is a more sophisticated law, intended to apply to more murderers. It does not follow, however, that its application to these petitioners should take place under the phrase "while the defendant was engaged in . . . commission of" in section 190.2, subdivision (a)(17). Because the law is more sophisticated than the prior law (and more sophisticated than the phrase "in perpetration of" used in the felony-murder statute) more care is required of the courts in determining the applicability of specific sections and phrases.

The change in the wording of the provision in issue from "during the commission" of the enumerated felonies to "while . . . engaged in commission of, *or the immediate flight after committing*" such felonies cannot be without significance. Assuming a general equivalence between "during" and "while engaged in," the significance of addition of the phrase "the immediate flight after committing" must be that the drafters did not expect the term "while engaged in" to be given the broad interpretation "in perpetration of" had been given in *Boss* and its progeny. In light of that appendage to the "while engaged in" phrase, for this court to read the appended phrase also as existing in the definition of the core phrase would be to provide a definition not only contrary to common usage but also contrary to the apparent intent of the drafters of the initiative. It would violate the "policy of this state to construe a penal statute as favorably to the defendant as its language and the cir-

cumstances of its application may reasonably permit; . . ." (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

Reading "while . . . engaged in" to exclude a period of flight before the petitioners reached a place of temporary safety, there is no question that under the facts presented at the preliminary examination that portion of the special circumstance allegations was not sufficiently shown. However, the trial court's ruling on section 995 motions may still be justified if the killing can be said to have occurred during immediate flight after commission of the rape and/or oral copulation.

## Part II

*Was there sufficient evidence to support a finding that petitioners "engaged in . . . the immediate flight after committing" rape and/or oral copulation when the killing occurred?*

Petitioners contend that "flight" cannot occur during a transportation of the victim away from the rape and/or oral copulation site. Petitioner Neil Jones notes that the reason for moving the victims to another location is unclear, but asserts "it was clearly not a flight." He quotes a definition of flight as "The evading of the course of justice by voluntarily withdrawing one's self in order to avoid arrest or detention, or the institution or continuance of criminal proceedings, regardless of whether one leaves jurisdiction." (Black's Law Dict. (4th ed. 1951) p. 768.) Both petitioners concede that the evidence arguably shows a kidnaping, but argue that that conduct does not constitute a "flight" within the meaning of the statute.

The Attorney General interprets the facts as showing that petitioners were fleeing the scene of their crimes in order to escape apprehension by the police and merely took the victims along in order to facilitate their escape. Shooting them at the house would have created a risk that someone would hear and call the police. He argues that the statement that they would not be killed was merely a ploy to insure passivity of the victims until the defendants had reached a place of safety. He urges that whenever a defendant retains control over his rape victim during a continuous transaction or course of conduct culminating in execution of the victim at a site away from the place where the physical act of rape occurred, that the murder is not only a murder "while engaged in the commission" but is also a murder in "the immediate flight after." De-

fendants must not be allowed to escape the punishment they warrant for the cold-blooded execution slaying of Charlotte Turner, he implores.

This court's request for further briefing asked if the parties could furnish any authority for the proposition that flight can take place during a transportation of the victim after rape or oral copulation. No authority has been cited by the parties or discovered by this court. This is hardly surprising in light of the fact that the flight issue normally arises in criminal law in the context of an instruction that a consciousness of guilt may be shown by evidence of the defendant's flight. (See CALJIC No. 2.52, and cases cited in Use Note and Comment.) Transportation of the victim after the initial crimes does not have the same probative value on the question of consciousness of guilt as does the kind of flight involved in most cases. The desire to prove the elements of false imprisonment or kidnaping in such a case would normally outweigh any need to examine the defendant's consciousness of guilt during the transportation.

Had petitioners left the victims at their home and either killed another person during flight from the scene or killed Ms. Turner or Mr. Greer during pursuit, clearly the phrase "engaged in . . . the immediate flight after committing" would apply to the killing. Thus, the narrow question here is whether a different result is called for because they retained control over the victims and left the crime scene with them.

One might argue that the "immediate flight" special circumstance should not apply in a victim transportation situation because the kidnaping special circumstance is intended to cover that situation. However, there are victim transportations which do not involve kidnaping (either because the asportation is too short (see *People v. Green, supra,* 27 Cal.3d 1, 66) or it is accomplished by means of fraud instead of force (*id.,* at p. 64) or even is consensual) but which arguably could constitute flight. Thus, the existence of a kidnaping special circumstance does not by itself suggest that the "immediate flight" special circumstance was not intended to apply to victim transportation situations.

It is the opinion of this court that the question of whether the petitioners were engaged in "immediate flight" from the rape and/or oral copulation should depend not upon whether they took the victims with them but upon their purposes and intentions upon leaving the scene of the crimes. If they were leaving to avoid detection and transportation of the victims would assist in that purpose, the fact that they might have

been kidnaping the victims at the same time should not negate their purpose of flight. Even if the transportation is with the intention of killing the victims, it could be part of the immediate flight if the killing itself is to facilitate the flight rather than for some separate purpose. Only if the transportation of the victims away from the initial crime scene were for some purpose other than facilitating avoidance of the detection for the initial crimes would the transportation not be considered "flight" from commission of the crimes.

It is true that this court's reading of "immediate flight after" will bring many victim transportation cases under this special circumstance. However, the contrary result would create a gap in the special circumstance law for those victim transportations which do not qualify as kidnapings. It seems clear that the electorate did not intend such a gap.[4] (See pp. 170-171, *ante*.)

In summary, while we conclude that it would torture the special circumstance statute to incorporate felony-murder concepts into the "while ... engaged in" phrase of section 190.2, subdivision (a)(17), our view is that the phrase "immediate flight after" commission should not be held inapplicable merely because the victims accompanied petitioners during flight.

Consequently, the remaining question is whether the evidence presented at the preliminary examination supports the inference that the petitioners' transportation of the victims away from their home was part of their flight to avoid detection for the sex crimes. The trial court's test on a motion to dismiss pursuant to section 995 is whether the evidence at the preliminary hearing provides "'some rational ground for assuming the possibility'" that the alleged acts were committed by the defendant. (*Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 955 [153 Cal.Rptr. 720].) This court, on review, may not substitute its judgment for that of the magistrate as to the weight of the evidence and every legitimate inference to be drawn from it must be drawn in favor of the information. (*Id.*) It is our view that the evidence permits an inference, notwithstanding Neil Jones' statement to the contrary, that the petitioners took the victims from the house for the purpose of leaving them

---

[4]The gap would be filled by section 190.2, subdivision (a)(10) in cases where the person killed was a witness killed to prevent testimony (fn. 3, *ante*). However, if the victims were transported without kidnaping and a nonwitness were killed during the "flight" no special circumstance would apply. The cause of the gap would then be the mere fact that the victims accompanied the killers during the "flight."

(dead or alive) in a remote place and facilitating their own avoidance of detection for the sex crimes. Read that way, the evidence shows that the killing took place during immediate flight after commission of the sex acts and the special circumstance allegations against both defendants were properly sustained by the trial court.[5]

The alternative writs are ordered discharged and the petitions for peremptory writ are denied.

Barry-Deal, J., concurred.

Feinberg, J., concurred in the judgment.

Petitions for a rehearing were denied September 25, 1981, and the opinion was modified to read as printed above. Petitioners' applications for a hearing by the Supreme Court were denied October 28, 1981. Bird, C. J., and Kaus, J., were of the opinion that the applications should be granted.

---

[5]An example of flight with a victim which fits more closely into the popular perception of flight would be the flight of a robber with a hostage to protect him from police bullets. While this might also constitute a kidnaping, few would argue that the presence of the victim negates the element of flight. If the victim were then killed by the robber no one would be surprised that the killing was considered to be in immediate flight after commission of the robbery.